

**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed:**
**May 6, 2019 15:02**

By: COLLIN R. FLAKE 0093428

Confirmation Nbr. 1700991

SCOTT FETZER COMPANY

vs.

MARCUS QUINN, ET AL.

CV 19 914924

**Judge:**  CASSANDRA COLLIER-WILLIAMS

**Pages Filed:**  60



EXHIBIT
A

## IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

THE SCOTT FETZER COMPANY,
28800 Clemens Rd.
Westlake, Ohio 44145

        Plaintiff,

    v.

MARCUS QUINN,
1703 Palma Sola Blvd.
Bradenton, Florida 34209

NATHAN RAMKER,
13420 Coonhunters Rd.
Bluegrass, Iowa 52726

       and

SUNFLORA, INC.,
8413 Laurel Fair Cir., Ste. 100
Tampa, Florida 33610

        Defendants.

Case No. _____

Judge _____

## COMPLAINT WITH JURY DEMAND

    Plaintiff The Scott Fetzer Company ("Scott Fetzer") for its Complaint against Marcus Quinn ("Quinn"), Nathan Ramker ("Ramker"), and SunFlora, Inc. ("SunFlora") (collectively, "Defendants"), alleges as follows:

### NATURE OF THE ACTION

    1.    This is an action for damages and injunctive relief to recover for the unlawful acts of Defendants, including breach of contract, tortious interference with contract, tortious interference with prospective business relations, unfair competition, and civil conspiracy. Scott Fetzer seeks to enjoin Quinn and Ramker from continuing to breach the Distributor Agreements they entered into with The Kirby Company ("Kirby"), an unincorporated division of Scott

Fetzer; to enjoin Defendants from continuing to induce distributors affiliated with Kirby to violate contractual agreements they have with the company; to enjoin Defendants from continuing to interfere with prospective business relations between Kirby and its distributor trainees; and to enjoin Defendants from continuing to compete unfairly against Kirby and conspire with those they have lured away from Kirby to solicit and recruit others.

## THE PARTIES

2.      Scott Fetzer is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 28800 Clemens Road, Westlake, Ohio 44145. Scott Fetzer does business through Kirby, an unincorporated division of Scott Fetzer, which is located at 1920 West 114th Street, Cleveland, Ohio 44102.  Hereinafter, Plaintiff will be referred to as "Kirby."

3.      Quinn is an individual who, upon information and belief, resides at 1703 Palma Sola Boulevard, Bradenton, Florida 34209.

4.      Ramker is an individual who, upon information and belief, resides at 13420 Coonhunters Road, Bluegrass, Iowa 52726.

5.      SunFlora is a corporation organized and existing under the laws of the State of Florida with its principal place of business at 8413 Laurel Fair Circle, Suite 100, Tampa, Florida 33610.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this action under R.C. 2305.01 because the amount in controversy exceeds the jurisdiction of the county courts.

7.      Personal jurisdiction is proper because Quinn and Ramker are parties to Distributor Agreements with Kirby under which they consented to the jurisdiction of this Court.

Personal jurisdiction also is proper under R.C. 2307.382 because Defendants have transacted business in Ohio, have caused tortious injury by an act in Ohio, and have caused tortious injury in Ohio to a corporation by acts outside this state committed with the purpose of injuring that corporation.

8.      Venue is proper because Quinn and Ramker are parties to Distributor Agreements with Kirby under which they consented to venue in this Court. Venue also is proper under Civ.R. 3(B)(7) because Kirby resides in Cuyahoga County, and because Defendants have transacted business in Ohio, have caused tortious injury by an act in Ohio, and have caused tortious injury in Ohio to a corporation by acts outside this state committed with the purpose of injuring that corporation.

## FACTUAL BACKGROUND

9.      Headquartered in Cleveland, Ohio, Kirby has manufactured high-end home cleaning systems, parts, and related accessories for over a century.

10.      Kirby sells its home cleaning systems exclusively through in-home demonstrations conducted under the direction of authorized independent distributors. Distributors are the lifeblood of Kirby's business model. They are responsible for promoting, maintaining, and increasing in-home sales and use of Kirby's home cleaning systems through the development of an independent sales force.

11.      Distributors are independent contractors who enter into a contractual relationship with Kirby through a Distributor Agreement. Section 2(b) of the Distributor Agreement provides that it is subject to termination "in the event [the distributor's] services are not available full time to the distributorship."

12.      Section 6(e) of the Distributor Agreement requires distributors to recommend "at least one qualified person from his/her sales force for possible appointment by [Kirby] as factory distributor" during each eighteen-month period the agreement is in effect.  Typically, a distributor recruits dealers to join his or her sales team and helps them learn Kirby's direct-sales methodology.  The distributor subsequently may recommend that certain dealers be appointed to the position of distributor trainee.  Dealers and distributor trainees are independent contractors of particular distributors.  Ultimately, a distributor trainee may operate his or her own distributorship if recommended by his or her appointing distributor and approved by Kirby.  Kirby incentivizes distributors to recommend distributor trainees for appointment to distributor through a program called the Road to Success, under which Kirby pays the appointing distributor a portion of the cost of every Kirby home cleaning system purchased by their appointees, and awards a bonus for maintaining a certain number of appointees annually.

13.      Section 16(c) of the Distributor Agreement is titled "Non-Solicitation."  It provides:  "During the term of this Agreement and for two (2) years thereafter (regardless of the reason for the end of the term), the Distributor will not, directly or indirectly, for or on behalf of the Distributor or any other person or entity, solicit, recruit, or contract with . . . attempt to solicit or recruit, or cause to be solicited or recruited any current Kirby Regional Vice President, Divisional Director, Factory Distributor, Distributor Trainee, Dealer, Canvasser, customer, and/or any employee of the Company, and/or anyone else with an independent contractor agreement with the Company and/or with any of its distributors, anywhere in the world."  This includes any individuals "who had such a relationship with the Company or had such an agreement at any time during the twelve (12) months preceding the prohibited conduct."

*Kirby's Policy on Prohibited Business Involvement*

14.     Under Section 6(a) of the Distributor Agreement, distributors are required to use their "best efforts," as determined by Kirby, in "promoting, maintaining and increasing the in-home sale and use of Kirby Systems in the Area through the development of a sales force devoted solely to the direct sale of Kirby Systems. . . .  All such efforts shall be in accordance with . . . all policies of [Kirby], as such policies may be established or revised from time to time by [Kirby]."  In addition, Section 26 provides that Kirby "from time to time may issue written policy statements to which Distributor agrees to adhere."

15.     Kirby issued one such written policy on October 23, 2018, titled "Factory Distributor Policy Regarding Prohibited Business Involvement" (the "Policy") (attached as Exhibit 1), because companies that sell products containing cannabidiol (or "CBD") are proselytizing Kirby's distributors and top salespeople in an attempt to recruit them to sell CBD products.  The legality of CBD and other cannabinoid products is disputed.  Yet, some of these companies falsely claim that CBD is legal in all fifty states, and also make unsubstantiated and unproven claims regarding the health benefits of CBD, prompting the Food and Drug Administration to issue warning letters to those companies.

16.     To protect Kirby's reputation and that of its distributors and their salespeople, Kirby took certain provisions from the Distributor Agreement and codified them in the Policy.  It provides that Kirby will terminate the Distributor Agreements of any distributors who:

- Do not use their best full time efforts to build and grow their Kirby distributorships;

- Have involvement with other business interests that distract them from spending their full time in their Kirby distributorships;

- Encourage, directly or indirectly, other members of the Kirby field to pursue business interest that, in the sole discretion of Kirby management, are not related to Kirby; and

- Own or have any interest, involvement, or investment in any business that is illegal under state or federal law, including any business that sells or promotes cannabinoid products, like CBD.

17.    By its terms, the Policy applies to both distributors and distributor trainees who "own[], or operate[], or whose spouse, or significant other or immediate family member owns or operates, a business that sells cannabinoid products including CBD."

*Quinn's Relationship with Kirby*

18.    Quinn began working as a dealer for a distributor of Kirby products in Florida approximately twenty years ago.  He advanced quickly and became a distributor trainee in January 2000.  He worked as a distributor trainee until September 2003.

19.    In September 2003, Quinn became an authorized distributor for Kirby in Florida. Over the next fifteen years, he also operated his distributorship in Alabama and Georgia.  He promoted many dealers to distributor trainees who ultimately became distributors.  He also operated one of the highest selling Kirby distributorships in the world.  Quinn was an eleven-time recipient of Kirby's highest sales award, the Golden Circle, which is given to distributors who purchase a minimum of 2,400 home cleaning systems in a calendar year.  He was so successful that Kirby appointed him as Divisional Director over an area covering 135 counties in Alabama, Florida, Georgia, and Mississippi.

20.    On January 16, 2009, Quinn signed a Distributor Agreement with Kirby (attached as Exhibit 2).  The agreement was made in Cleveland, Ohio.

21.    On March 22, 2016, Quinn signed an Assignment and Assumption Agreement (attached as Exhibit 3), pursuant to which he assigned his rights in the Distributor Agreement to

his distributorship, Promotion Enterprises LLC.  Under Section 4 of the Assignment and

Assumption Agreement, Quinn agreed that he "shall continue to be personally bound by, and

shall comply with, all provisions of the Distributor Agreement[.]"

***Ramker's Relationship with Kirby***

22.     Ramker began working as a dealer for his father's Kirby distributorship in

Wisconsin approximately three decades ago.  After several years as a successful dealer, he

became a distributor trainee.  He worked as a distributor trainee until December 1996.

23.     In December 1996, Ramker was approved to operate his own Kirby

distributorship in Florida and he did so until 2005, when he moved his distributorship to Iowa

and Illinois.  He promoted a number of dealers to distributor trainees who ultimately became

distributors.  Ramker's distributorship also was highly successful in terms of sales, earning him

multiple awards and honors including membership in the Golden Circle four times.  He was so

successful that Kirby approved him to become a Divisional Director in January 2009.

24.     On August 31, 2006, Ramker signed a Distributor Agreement with Kirby

(attached as Exhibit 4).  After changing the name of his distributorship and becoming a

Divisional Director, he signed a superseding Distributor Agreement with Kirby on January 1,

2009 (attached as Exhibit 5).  Both agreements were made in Cleveland, Ohio, and, with respect

to the covenants and provisions related to the claims in this action, they are substantively

identical.

25.     On December 11, 2014, Ramker signed an Assignment and Assumption

Agreement (attached as Exhibit 6), pursuant to which he assigned his rights in the Distributor

Agreement dated August 31, 2006, to his distributorship Top Notch & Associates Inc.

Subsequently, on October 2, 2017, he signed a substantively identical Assignment and

Assumption Agreement (attached as Exhibit 7) with his distributorship Big River HCS Inc. Under Section 4 of these Assignment and Assumption Agreements, Ramker agreed that he "shall continue to be personally bound by, and shall comply with, all provisions of the Distributor Agreement[.]"

***Quinn and Ramker Violate the Distributor Agreements, Resulting in their Termination***

26.    After operating an authorized distributorship since 2003, and accepting all of the benefits of his relationship with Kirby, Quinn surreptitiously began running a company called SunFlora. He currently serves as the President of SunFlora.

27.    SunFlora was incorporated in Florida on May 22, 2018. It sells various CBD products under the "SunFlora" and "SunMed" labels. The company operates a web site under the domain name "CBDRX4U," on which it makes unsubstantiated and unproven claims about the health benefits of CBD. SunFlora also recruits individuals to own their own stores that sell CBD products. Upon information and belief, SunFlora utilizes a program similar to the Road to Success program developed by Kirby, offering financial incentives to affiliates that recruit others to open CBD stores.

28.    In mid- to late-2018, Kirby learned of Quinn's involvement in selling and promoting CBD products. Kirby also became aware that Quinn directly or indirectly was soliciting and attempting to recruit active Kirby distributors to become involved in selling or promoting CBD products. One of the distributors he convinced to become involved in the sale of SunFlora's products was Ramker.

29.    Ramker and his wife began operating multiple stores selling SunFlora's products in Iowa. Subsequently, the volume of home cleaning systems that Ramker purchased from Kirby (and sold to customers) steadily declined. Ramker's son, who was a distributor trainee affiliated

with Ramker's Kirby distributorship, also opened a store selling CBD products in Missouri. Ramker, his wife, and his son then began soliciting and recruiting Kirby distributors to become involved in selling CBD products.

30.     On October 8, 2018, counsel for Kirby sent a letter to Quinn demanding that he cease and desist violating his Distributor Agreement by selling CBD products and soliciting and recruiting active distributors to do the same.  Quinn's wrongful conduct only intensified, however, causing Kirby to terminate his Distributor Agreement effective February 18, 2019.

31.     Ramker's wrongful conduct likewise escalated, and Kirby sent a letter notifying him of the termination of his Distributor Agreement effective February 2, 2019.  Although Kirby intended to terminate the operative agreement from 2009, its letter inadvertently referenced and enclosed the agreement from 2006.  Nevertheless, both Kirby and Ramker since have treated the Distributor Agreement from 2009 as being terminated.

32.     The termination letters from Kirby reminded Quinn and Ramker of certain obligations that were activated upon the termination of their Distributor Agreements, including the non-solicitation covenant contained in Section 16(c) and the requirement that they sell back to Kirby all new and unused home cleaning systems that they still owned pursuant to Section 15(a).  Neither Quinn nor Ramker fulfilled those obligations.

***The Ongoing Wrongful Conduct of Defendants***

33.     In an effort to quickly expand SunFlora's distribution network, Defendants have continued to brazenly solicit and recruit active distributors, distributor trainees, and/or their spouses or immediate family members, to join them in selling CBD products.  That misconduct not only violates the terms of Quinn's and Ramker's Distributor Agreements, but also constitutes tortious interference with the agreements of the distributors Defendants have solicited and

recruited as well as the prospective business relations between Kirby and the distributor trainees Defendants have solicited and recruited.

34.     Quinn and Ramker, on behalf of themselves and SunFlora, have directly or indirectly solicited, recruited, or otherwise have been in contact with Kirby distributors or distributor trainees throughout the country, including in at least the following states:  Alabama, California, Florida, Georgia, Indiana, Iowa, Kentucky, Louisiana, Minnesota, Mississippi, Missouri, New Hampshire, North Carolina, Ohio, and Wisconsin.

35.     Quinn and Ramker, on behalf of themselves and SunFlora, have induced a number of distributors to directly or indirectly sell CBD products in violation of Quinn's, Ramker's, and those distributors' agreements with Kirby.  Many of these individuals were highly successful, long-time distributors, including some who were awarded the Golden Circle and consistently were among the top distributors in the world.  Once these individuals became involved in selling CBD products, however, the volume of home cleaning systems they purchased from Kirby (and sold to consumers) declined.

36.     In addition, Quinn and Ramker, on behalf of themselves and SunFlora, have induced a number of distributor trainees to directly or indirectly sell CBD products in violation of Quinn's and Ramker's Distributor Agreements and the Policy, which applies to distributors and distributor trainees alike.  Once these distributor trainees became involved in selling CBD products, they were disqualified from being approved to operate their own Kirby distributorships.

37.     Upon information and belief, in an effort to conceal their wrongful conduct, Quinn and Ramker encourage the Kirby distributors they solicit and recruit to place CBD stores in the names of their spouses and/or immediate family members to avoid detection from Kirby.

38.     Upon information and belief, the majority of stores selling and promoting SunFlora's CBD products are owned and operated by current or former Kirby distributors and/or their spouses or immediate family members.

## COUNT I
### Breach of Contract
### (Quinn and Ramker)

39.     Kirby incorporates by reference the allegations set forth in paragraphs 1 through 38 of the Complaint as if fully set forth herein.

40.     Kirby and Quinn entered into the Distributor Agreement attached as Exhibit 2 on January 16, 2009.  Kirby and Ramker entered into the Distributor Agreement attached as Exhibit 5 on January 1, 2009.

41.     The Distributor Agreements are valid and enforceable.

42.     Kirby fully performed its obligations under the Distributor Agreements.

43.     As described in detail above, Quinn and Ramker breached their contractual obligations to Kirby by violating numerous covenants and provisions in the Distributor Agreements including, without limitation, Sections 6(a), 15(a), 16(c), and 26.

44.     The breaches described in the preceding paragraph are material.

45.     As a direct and proximate result of Quinn's and Ramker's wrongful conduct, Kirby has suffered and continues to suffer damages in an amount that is not presently ascertainable but exceeds $15,000.00 and will be established at trial.

## COUNT II
### Tortious Interference with Contract
### (Quinn, Ramker, SunFlora)

46.     Kirby incorporates by reference the allegations set forth in paragraphs 1 through 45 of the Complaint as if fully set forth herein.

47.     The Distributor Agreement contains covenants specifically providing that, during the contractual relationship and for a defined period thereafter, distributors shall not solicit, recruit, or contract with current or former distributors of Kirby.

48.     The Distributor Agreement also contains provisions requiring that distributors use their "best efforts," as determined by Kirby, to build and grow a successful distributorship, and that they do so in accordance with all Kirby policies.

49.     Quinn and Ramker entered into Distributor Agreements with Kirby.  Accordingly, Defendants knew of the existence of these covenants and provisions in the Distributor Agreements.  Quinn and Ramker also were reminded of the non-solicitation covenants in the letters they received from Kirby terminating their Distributor Agreements.

50.     Despite such knowledge, Quinn and Ramker, acting on behalf of themselves and SunFlora, caused and have attempted to cause numerous Kirby distributors to breach their Distributor Agreements by failing to devote their best efforts to their distributorships and by failing to adhere to the Policy.

51.     Defendants knowingly and intentionally enjoyed the economic benefits of these breaches.

52.     There was no privilege or justification for the conduct of Defendants.

53.     By causing distributors to breach their Distributor Agreements with Kirby, Defendants have tortiously interfered with Kirby's rights under those agreements.

54.     As a direct and proximate result of the wrongful conduct of Defendants, Kirby has suffered and continues to suffer damages in an amount that is not presently ascertainable but exceeds $15,000.00 and will be established at trial.

55.     Defendants engaged in the above conduct in an intentional, willful, and malicious manner, with an improper motive and through improper means.  They sought to injure Kirby and unfairly reap the benefits of its efforts, entitling Kirby to punitive or exemplary damages and reasonable attorney's fees.

56.     Defendants will continue such wrongful conduct, and Kirby will be irreparably harmed thereby, unless such activities are enjoined by this Court.

**COUNT III**
**Tortious Interference with Prospective Business Relations**
**(Quinn, Ramker, SunFlora)**

57.     Kirby incorporates by reference the allegations set forth in paragraphs 1 through 56 of the Complaint as if fully set forth herein.

58.     Kirby has prospective business relations with the distributor trainees who sell its products.  The Distributor Agreement requires distributors to recommend qualified salespeople for possible appointment by Kirby as distributors.  Moreover, through its Road to Success program, Kirby expects and incentivizes distributors to recommend distributor trainees from their sales force to operate their own Kirby distributorships.

59.     Defendants knew of the prospective business relations between Kirby and its distributor trainees because Quinn and Ramker entered into Distributor Agreements with Kirby, participated in and benefited from the Road to Success program, and recommended distributor trainees who ultimately were approved by Kirby to become distributors.

60.     Despite such knowledge, Quinn and Ramker, acting on behalf of themselves and SunFlora, knowingly and intentionally caused and have attempted to cause distributor trainees to violate the Policy by becoming involved in the sale of CBD products, terminating those

distributor trainees' prospective business relations with Kirby by disqualifying them from being able to operate their own distributorships.

61.     There was no privilege or justification for the conduct of Defendants.

62.     As a direct and proximate result of the wrongful conduct of Defendants, Kirby has suffered and continues to suffer damages in an amount that is not presently ascertainable but exceeds $15,000.00 and will be established at trial.

63.     Defendants engaged in the above conduct in an intentional, willful, and malicious manner, with an improper motive and through improper means.  They sought to injure Kirby and unfairly reap the benefits of its efforts, entitling Kirby to punitive or exemplary damages and reasonable attorney's fees.

64.     Defendants will continue such wrongful conduct, and Kirby will be irreparably harmed thereby, unless such activities are enjoined by this Court.

**COUNT IV**
**Unfair Competition**
**(Quinn, Ramker, SunFlora)**

65.     Kirby incorporates by reference the allegations set forth in paragraphs 1 through 64 of the Complaint as if fully set forth herein.

66.     In an effort to quickly expand SunFlora's distribution network, Quinn and Ramker have raided highly successful, long-time distributors and distributor trainees from Kirby by soliciting and recruiting them to sell or promote CBD products.  Upon information and belief, the majority of stores selling SunFlora's products are owned and operated by current or former Kirby distributors and/or their spouses or immediate family members.  Defendants' unfair commercial practices have harmed the business of Kirby and constitute unfair competition under the common law of Ohio.

67.     Defendants engaged in the above conduct in an intentional, willful, and malicious manner.

68.     They have benefited and will continue to benefit from their acts of unfair competition. As a direct and proximate result, they have damaged and continue to damage Kirby in an amount that is not presently ascertainable but exceeds $15,000.00 and will be established at trial.

69.     Defendants will continue their acts of unfair competition, and Kirby will be irreparably injured thereby, unless such activities are enjoined by this Court.

**COUNT V**
**Civil Conspiracy**
**(Quinn, Ramker, SunFlora)**

70.     Kirby incorporates by reference the allegations set forth in paragraphs 1 through 69 of the Complaint as if fully set forth herein.

71.     Quinn, acting in concert with Ramker, SunFlora, and others not named as defendants, intentionally and maliciously combined, conspired, confederated, and agreed to commit torts and unlawful acts against Kirby including, without limitation, inducing or attempting to induce Kirby distributors to violate their Distributor Agreements with Kirby and distributor trainees to violate the Policy and terminate their prospective business relations with Kirby.

72.     As a result of this conspiracy, Defendants have damaged and continue to damage Kirby in an amount that is not presently ascertainable but exceeds $15,000.00 and will be established at trial.

73.     Defendants will continue their conspiratorial acts, and Kirby will be irreparably injured thereby, unless such activities are enjoined by this Court.

**PRAYER FOR RELIEF**

WHEREFORE, Kirby prays for entry of judgment as follows:

A.      That this Court preliminarily and permanently enjoin further breaches or attempted breaches of the Distributor Agreements between Kirby and Quinn, and Kirby and Ramker, by prohibiting Quinn and Ramker from directly or indirectly soliciting, recruiting, or contracting with, or otherwise inducing or attempting to induce any distributor of Kirby to violate their distributor agreements, for a period of two years running from the date of entry of judgment;

B.      That this Court preliminarily and permanently enjoin further acts or attempted acts of tortious interference with Kirby's distributor agreements and prospective business relations by Defendants;

C.      That this Court preliminarily and permanently enjoin further acts or attempted acts of unfair competition and conspiracy by Defendants;

D.      That judgment be entered for Kirby and against Defendants for compensatory and related damages, all available statutory damages, and punitive or exemplary damages;

E.      That Kirby be awarded its costs of suit and attorney's fees pursuant to Section 16(f) of Quinn's and Ramker's Distributor Agreements or as otherwise appropriate; and

F.      For such other and further relief as this Court deems just and proper.

**JURY DEMAND**

Pursuant to Civ.R. 38(B), Kirby hereby demands a trial by jury on all issues so triable.

Dated:  May 6, 2019

Respectfully submitted,


/s/ *Collin R. Flake*

Robert P. Ducatman (0003571)
E-mail:  rducatman@jonesday.com
Christopher M. McLaughlin (0078186)
E-mail:  cmmclaughlin@jonesday.com
Collin R. Flake (0093428)
E-mail:  cflake@jonesday.com
JONES DAY
North Point, 901 Lakeside Avenue
Cleveland, Ohio 44114-1190
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212

Counsel for Plaintiff
THE SCOTT FETZER COMPANY

# EXHIBIT 1

## FACTORY DISTRIBUTOR POLICY REGARDING
## PROHIBITED BUSINESS INVOLVEMENT

Per the Factory Distributor Agreement, every Kirby Factory Distributor must use their best full time efforts to build and grow a successful Kirby factory distributorship. This means that The Kirby Company will terminate the Factory Distributor Agreement with any Factory Distributors who:

- Do not use their best full time efforts to build and grow their Kirby distributorships;

- Have involvement with other business interests that distract them from spending their full time in their Kirby factory distributorships;

- Encourage, directly or indirectly, other members of the Kirby field to pursue business interests that, in the sole discretion of Kirby management, are not related to Kirby;

- Own or have any interest, involvement, or investment in any business that is illegal under state or federal law.  This includes any business that sells or promotes cannabinoid products, like CBD;

Kirby will terminate any Factory Distributor who owns, or operates, or whose spouse, or significant other or immediate family member, owns or operates, a business that sells cannabinoid products including CBD.

This Policy also applies to Distributor Trainees.  Kirby will terminate any Factory Distributor whose Distributor Trainee: owns or operates, or whose spouse, significant other, or immediate family member owns or operates, a business that sells cannabinoid products including CBD.

See Factory Distributor Agreement at Sections 1, 2(b), 6(a), 7, 14, and 16(c).

October 23, 2018

# EXHIBIT 2

United States



DISTRIBUTOR AGREEMENT

THIS DISTRIBUTOR AGREEMENT hereinafter called "Agreement"), is made at Cleveland, Ohio, as of this 16TH day of JANUARY, 2009, (the "Effective Date"), by and between The Kirby Company, a Division of The Scott Fetzer Company (a Delaware corporation) with its principal place of business located at 1920 W. 114th Street, Cleveland, Ohio 44102 (hereinafter called the "Company") and   MARCUS P QUINN

an individual ("Distributor"), with a principal place of business located at    106 COMMERCE PARKWAY

PELHAM    AL .   35124

RECITALS:

WHEREAS, the Company manufactures, assembles and distributes a home cleaning system consisting of vacuum cleaners, accessories, and attachments primarily for use by consumers in the home (hereinafter referred to as "Kirby Systems"): and parts (hereinafter referred to as "Kirby Parts"). Kirby Systems and Kirby Parts are hereinafter collectively referred to as "Kirby Products;" and

WHEREAS, the Company recognizes that superior products together with individualized customer in-home demonstration and installation and convenient customer service, including warranty service, are the hallmark of the Kirby trade name and the basis for the Company's reputation in the marketplace and its continuing ability to compete; and

WHEREAS, to protect and maintain the Kirby trade names, reputation and competitiveness in the marketplace, the Company has established and implemented a marketing system for distribution and sale of Kirby Systems exclusively to consumer end-users by in-home demonstration through authorized distributors qualified to provide such individualized customer demonstration and service (the "Marketing System"); and

WHEREAS, the Company has determined that consistent sale and distribution of Kirby Systems other than to consumer end-users by in-home individualized demonstration through authorized distributors qualified to provide such individualized customer service will substantially harm the Kirby trade names and its market reputation, thereby substantially reducing its ability to compete; and

WHEREAS, the Company, through its distributors, desires to sell a home cleaning system of superior quality, versatility and performance only to consumer end-users in the convenience of their homes and based on the merits of the product and using only lawful and ethical selling practices; and

WHEREAS, the Company is vitally concerned with protection and maintenance of its goodwill by assuring continuing satisfaction of consumer end-users with Kirby Products and requires that users have available through a local authorized distributor convenient and qualified installation, instruction and service; and

WHEREAS, the Company believes that the maintenance, promotion and preservation of its Marketing System and the provisions of this Agreement that implement that Marketing System, including the requirement for Distributor to present qualified persons from Distributor's own sales force to the Company for possible appointment as distributors, are essential to its ability to preserve its share of the market and to compete effectively with other manufacturers of home cleaning systems and related products; and

1

U.S. - Rev. 12/08

WHEREAS, in keeping with the above-stated purposes, the Company will only appoint and retain distributors who are committed to the Company's Marketing System, who use lawful and ethical selling practices, who will provide convenient and qualified localized installation, instructions, and service and who will recommend to the Company qualified persons from within their own sales force for possible appointment by the Company as distributors; and

WHEREAS, Distributor represents that he/she is willing and able to commit to sell and distribute Kirby Systems in accordance with the Company's Marketing System and through lawful and ethical selling practices, will provide convenient and factory qualified installation, instructions, and service and will recommend to the Company qualified persons from within Distributor's own sales force for possible appointment as distributors.

Now, THEREFORE, in consideration of the above-stated premises, and other valuable consideration provided to Distributor (including, but not limited to, access to and the opportunity to use and profit from the Company's proprietary business model and confidential information, under the terms set forth herein), the receipt and sufficiency of which are hereby acknowledged, the parties hereto mutually agree as follows:

1. *Principal Owner.*  (a) The Company and Distributor agree that personal knowledge and experience in the sale of Kirby Products is essential to the success of Distributor and to the benefits to be gained by the Company as consideration under this Agreement. Distributor hereby represents, and the Company and Distributor therefore agree, that the Distributor is and will remain the principal owner of the distributorship, with full managerial authority for the day-to-day operations of the distributorship.

(b) The Company and Distributor further agree that the existence of this Agreement is dependent upon the continued functioning of the Distributor as the principal owner and manager and that any change in the ownership or managerial authority of the operations of the distributorship, or upon the substantial reduction or termination of managerial authority of Distributor for day-to-day operations of the distributorship, without the prior written approval of the Company may result in the immediate termination of this Agreement pursuant to Section 14(c) hereof.

2. *Appointment.*  (a) The Company hereby appoints Distributor as an authorized distributor of Kirby Products and assigns to Distributor, as his/her Area of primary responsibility, the geographic area (the "Area") described in Exhibit A, attached hereto and incorporated by reference herein. The Company shall have the right to change the Area from time to time and at any time by giving written notice thereof to Distributor, and any such change in the Area shall become effective on the date specified in said notice. All references in this Agreement to the Area shall be deemed to refer to the Area as it may be so changed by the Company.

(b) Distributor acknowledges that this appointment results from Distributor's demonstrated capabilities and personal experience in sales through in-home demonstrations in accordance with the Company's Marketing System, as well as Distributor's commitment to recommend to the Company qualified persons from Distributor's own sales force for possible appointment by the Company as distributors, and thus agrees that this Agreement is a personal service contract and will terminate automatically upon the death or disability of Distributor. Distributor further agrees that in the event his/her services are not available full time to the distributorship, this Agreement shall be subject to termination pursuant to Section 14(b) hereof.

(c) Distributor hereby accepts such appointment and agrees to comply with all of the terms of this Agreement and with all of the policies that may be established or revised from time to time by the Company.

3. *Exclusively Consumer End-User Sales/Display of MSRP.*  (a) Except for sales within Distributor's own sales force and commercial sales in accordance with Section 8, Distributor agrees that all Kirby Systems purchased hereunder are purchased solely and exclusively for resale by in-home individualized customer demonstration to consumer end-users pursuant to the Company's Marketing System, unless the Company otherwise expressly authorizes in writing. Distributor further agrees to use his/her best efforts to conduct the in-person demonstration in the home of the consumer end-user. Distributor agrees that any other resale is strictly prohibited by this Agreement and will constitute a material breach hereof by Distributor. Distributor agrees that he/she is directly and solely responsible for his/her Distributor Trainees' (as defined in Section 6(a)), Independent Dealers' (as defined in Section 6(b)) and/or employees' compliance with this section.

(b) It is a breach of this Agreement for Distributor or Distributor's agents, employees, Distributor Trainees, Independent Dealers or the like to sell any Kirby System to any person or entity if the purchase is for the purpose of re-sale, as opposed to

2                                                                                                          U.S. - Rev. 12/08

consumer end-use.

(c) Distributor further agrees that he/she will not remove, obscure, deface or otherwise obstruct from obvious view any manufacturer's suggested retail price ("MSRP") placed by the Company on any Kirby Product, including but not limited to the Kirby System. Distributor shall take all steps necessary to ensure that any such MSRP remains readily and clearly visible to customers and prospective customers, which steps shall include Distributor advising his/her Independent Dealers, Distributor Trainees and employees of the obligation that any such MSRP shall be readily visible to customers and prospective customers and requiring that his/her Independent Dealers, Distributor Trainees and employees not remove, obscure, deface or otherwise obstruct from obvious view any such MSRP.

(d) A breach of any of the obligations contained in this Section 3 may result in the termination of this Agreement, pursuant to Section 14(c), in addition to any other remedies to which the Company may be entitled.

4. *Prices and Terms.*

(a) *Distributor's Cost.* The prices to be paid by Distributor to the Company for Kirby Products purchased hereunder shall be the Company's established distributor net prices in effect at the time of shipment. The Company shall have the right to change any distributor net price from time to time and at any time by giving written notice thereof to Distributor, and any such change shall become effective on the date specified in said notice.

(b) *Company's Terms/Conditions of Sale.* All orders from Distributor for Kirby Products shall be subject to acceptance or rejection, in whole or in part, by the Company at Cleveland, Ohio, and any order shall be deemed to have been accepted only upon shipment by the Company. Kirby Products shall be shipped to Distributor F.O.B. Cleveland, Ohio; Andrews, Texas; or Company warehouse. All transportation and insurance expense and all risk of loss or damage after delivery by the Company to the initial forwarder or carrier shall be borne by Distributor. Despite any claim as to passage of title, the Company retains all security and other legal rights, including rights of resale, recession, stoppage in transit and the right to seize, reclaim and hold the Kirby Products in the carrier's or warehouseman's possession until such time as Distributor pays the purchase price in full. Company, at all times, also retains all rights to reclaim and seize Kirby Products for repurchase at cost from Distributor if Distributor is in breach of any term of this Agreement. Payment shall be Cash With Order, C.O.D., or as otherwise approved by the Company before shipment. In the event the Company incurs attorney's fees or costs associated with any collection effort arising out of the Company's sale of Kirby Products to Distributor, Distributor agrees to pay the Company's reasonable fees and costs associated therewith, plus interest accruing from the date payment was due.

5. *Trademark License.* The Company hereby grants to Distributor a non-exclusive license to use, without power to sublicense, in accordance with policies announced by the Company from time to time, the Company's trademarks, service marks, symbols, logotypes, emblems and commercial signatures in the Area in connection with Kirby Products, and in connection with Distributor-sponsored campaigns and promotions, provided, however, that (i) such license does not include the right to use any Company name, mark or symbol as a part of any Distributor's registered corporate name or to grant licensing authority to vendors for the purpose of resale; (ii) Distributor does not have the right under this license to use any Company name, mark or symbol in any electronic medium, including but not limited to the Internet, World Wide Web, radio and/or television broadcast; and (iii) all rights and licenses granted herein or pursuant hereto shall terminate automatically upon the termination of this Agreement for any reason. Prior to the use of any Company trademark, service mark, symbol, logo, emblem or commercial signature in any form of advertising or printed document, Distributor must receive advance written approval from the Company.

6. *Distributor's Primary Obligations.* (a) Distributor shall use his/her best efforts (as determined by the Company) in (i) promoting, maintaining and increasing the in-home sale and use of Kirby Systems in the Area through the development of a sales force devoted solely to the direct sale of Kirby Systems; (ii) providing or arranging for complete, convenient and qualified service to all users of Kirby Systems in the Area; and (iii) recommending to the Company qualified persons from Distributor's sales force for possible approval by the Company (at Company's sole discretion) as distributors (such persons referred to as "Distributor Trainees"). All such efforts shall be in accordance with purposes stated at the outset of this Agreement and all policies of the Company, as such policies may be established or revised from time to time by the Company. In addition, Distributor also agrees that he/she shall not, directly or indirectly, have an ownership interest in or participate in any other business or businesses in the Area that market or sell

U.S. - Rev. 12/08

products to consumer end-users by in-home demonstration.  Unless expressly provided to the contrary in this Agreement, all obligations to be performed by Distributor shall be at Distributor's sole cost and expense.

(b) *Sales Force and Facilities.*  Distributor shall: (i) maintain within the Area a proper and satisfactory office, sales meeting room and service facility (or arrange adequate and acceptable service facilities), acceptable to and in keeping with standards established by the Company from time to time; and (ii) establish and maintain in the Area a network of Independent Dealers for the exclusive in-home demonstration, installation, sale and service of Kirby Systems in accordance with the Company's Marketing System. As used herein, the term "Independent Dealer" shall refer to any person who receives Kirby Systems from the Distributor or a Distributor Trainee for sale in accordance with the Company's Marketing System. The appointment of such Independent Dealers by Distributor shall be in accordance with the purposes stated at the outset of this Agreement, and in compliance with the terms of this Agreement and all policies of the Company as such policies may be established or revised from time to time by the Company. Distributor shall take all necessary and appropriate action (at Distributor's sole cost and expense) to ensure that members of his/her sales force do not present a risk of harm to other persons, including customers and prospective customers.  It is Distributor's responsibility to determine what actions are necessary and appropriate under the circumstances to fulfill this obligation, including, but not limited to performing criminal background checks.

(c) *Prohibited Sales of Kirby Products.*  Distributor shall not sell or offer for sale as new any Kirby Products which have been used, reconditioned, rebuilt or returned by other consumers. Distributor shall not represent any Kirby Product to be new on which the name or serial number has been defaced or altered or from which such name or serial number has been removed. Distributor shall not in any way: (i) change, alter or participate in any change or alteration of any Kirby Product, including without limitation the removal or alteration of the name or serial number; (ii) sell any Kirby Product from which any serial number has been removed, defaced, covered, destroyed or otherwise altered; or (iii) sell any Kirby Product under circumstances which Distributor knows or reasonably should know will involve the removal, defacement, covering, alteration or destruction of any serial number.

(d) *Customer Service.*  In order to protect the Company's goodwill and to maximize the use and appreciation of Kirby Systems, each consumer end-user of Kirby Systems in the Area shall have available from Distributor local, convenient and qualified installation, instruction and service.  In fulfilling this obligation, Distributor shall:

(i)     comply with all service policies and procedures established from time to time by the Company;

(ii)    provide prompt, courteous, and efficient service on all Kirby Systems;

(iii)   provide any repair service required of a Kirby System in accordance with the Kirby Limited Warranty;

(iv)    perform all service in a workmanlike manner and in accordance with professional standards and requirements of governmental authorities; and

(v)     carry in stock at all times an inventory of genuine Kirby Parts and/or parts sold or approved by the Company sufficient to enable performance of the foregoing service responsibilities.

Distributor shall receive and promptly investigate all complaints from consumer end-users of Kirby Systems in the Area, and shall make good-faith efforts to promptly resolve all complaints in a fair and equitable manner to the consumer end-user's satisfaction.

(e) *Requirements.*  Distributor shall: (i) maintain an appropriate number of active full and part-time sales personnel to adequately solicit sales in and service his/her Area; (ii) as a minimum performance standard, attain the lesser of either thirty (30) purchases and sales of Kirby Systems per month, or a monthly sales frequency ratio of 1:500 (that is, one sale per 500 saleable households) for Distributor's Area; and (iii) recommend to the Company during each eighteen (18) month-period this Agreement is in effect at least one qualified person from his/her sales force for possible appointment by the Company as a factory distributor. Notwithstanding the minimum performance standards described above, Distributor shall make best efforts to attain at least fifty (50) purchases and sales of Kirby Systems per month.  As used herein, a "sale" shall be deemed a "direct sale" if the Kirby System has been demonstrated and installed in the home of the consumer end-user, and the consumer end-user has received proper instruction with respect to the operation and maintenance of the Kirby System, at or before the time of the sale.  Specific quotas for Distributor

4                                                                          U.S. - Rev. 12/08

with respect to the number of Independent Dealers, direct sales for the Area or the number of qualified persons to be recommended for appointment as factory distributors may be established for the Area by the Company. The Company shall have the final authority to determine any such quotas as it sees fit in order to meet its marketing objectives.

(f) *Verification with Customer.* Distributor is responsible for all sales to consumer end-users. Therefore, in order to maintain and promote the image of the Kirby name, the Company recommends that Distributor verify and confirm: (i) the purchaser has received proper installation and instructions with respect to the operation and maintenance of the Kirby System; (ii) that all representations made to the purchaser by any Distributor Trainee or Independent Dealer have been completely fulfilled; and (iii) that the purchaser has retained an accurately completed copy of the appropriate Registration Card which has been signed by the authorized person.

(g) *Records.* Distributor shall maintain books and records which show, with respect to each Kirby Product sold or distributed by Distributor, the name and address of the purchaser, the date of sale, the serial number where applicable and any other information related to the Kirby Limited Warranty or related to the Company's obligations or responsibilities under federal, state or local consumer protection or safety statutes or regulations. Distributor shall retain all such books and records for at least five (5) years from the date of sale. Distributor shall, upon the Company's request, promptly furnish to the Company such books and records (or summaries or copies thereof, if so requested), as well as all other information, including reports, answers to questionnaires, etc., which may assist the Company in the proper conduct of its business.

(h) *Reports and Registration Cards.* Distributor shall submit to the Company, monthly, a Consumer Installation Report in accordance with and on forms provided by the Company, and such other reports as the Company reasonably requests.. Distributor shall report only firm sales, defined as sales which have been verified by Distributor, approved by any bank or financial company, if applicable, and on which the buyer's right to cancel, if applicable, has elapsed. For each sale of a Kirby System, which is a direct sale as defined in Section 6(e) above, Distributor shall also submit the completed Registration Card signed by the consumer end-user. The Company shall pay to Distributor a fee (as determined by the Company) for each such Registration Card submitted by the Distributor within ninety (90) days from the date of the invoice reflecting Distributor's purchase of the Kirby System corresponding to such Registration Card. Failure to timely submit reports required by the Company and any appropriate Registration Cards or the submission of false or fraudulent information on any such report or Registration Cards may constitute grounds for immediate termination of this Agreement pursuant to Section 14(c) hereof.

7. *Legal and Ethical Requirements.* In connection with this Agreement and with Distributor's business of direct in-home sales of consumer products, Distributor agrees to abide by and adhere to all federal, state and local statutes, regulations and ordinances, including but not limited to the rules and regulations of the Federal Trade Commission. Distributor further agrees to comport his/her business to the highest of ethical standards (as determined by the Company in its sole discretion). Distributor shall be solely responsible for the conduct and sales techniques of his/her Independent Dealers, Distributor Trainees, employees and representatives.

8. *Multiple Sales to Commercial User.* Distributor may sell Kirby Systems to commercial users such as motels, restaurants or other commercial establishments; however, a sale of more than three (3) Kirby Systems to any one commercial user must be shipped by the Company directly to the commercial user. Distributor is obligated to notify the Company of any proposed sale of more than three (3) Kirby Systems to a commercial user and to assist in arranging for direct shipment of such Kirby Systems by the Company.

9. *Indemnification.*

(a) *Company's Indemnification.* The Company shall indemnify, defend and hold Distributor harmless from and against any and all liability, damage or expense incurred in connection with any claim, demand or suit (any "Claim") based on (i) infringement of any United States Patent by reason of Distributor's sale of any unaltered Kirby Product purchased from the Company, or (ii) infringement of any trademark by reason of Distributor's use of any trademark licensed hereunder; provided, however, that Distributor shall: (x) give the Company prompt written notice of any such Claim; (y) permit the Company to defend or settle any Claim; and (z) provide the Company with every reasonable assistance the Company may request in resisting such Claim. The foregoing indemnification obligation shall not apply if Distributor is alleged to be responsible for any negligence, misconduct or wrongdoing in connection with any such Claim.

U.S. - Rev. 12/08

(b) *Distributor's Indemnification.* Distributor shall indemnify, defend and hold harmless the Company, its officers, directors, employees, agents, representatives and servants (collectively, the "Company Indemnitees") from and against any and all liability, damage or expense incurred by any Company Indemnitees in connection with any Claim based in whole or in part on the actual or alleged (i) acts or omissions of Distributor, his/her sales force, employees, Independent Dealers and/or Distributor Trainees (collectively, the "Distributor Parties"); (ii) statements, representations or omissions made by any Distributor Parties in connection with any Kirby Products; or  (iii) breach by Distributor of any obligation or covenant contained in this Agreement or any Company policy, as may be promulgated from time to time.  In connection with any Claim, the Company shall: (y) give Distributor prompt written notice of any such Claim; and (z) provide Distributor with every reasonable assistance which Distributor may request in resisting such Claim.

10.  *Discontinuance and Modification of Kirby Products.*  Company reserves the right at any time to change, modify or discontinue any model, type or design of any Kirby System or Kirby Parts provided to Distributor under this Agreement.

11.  *Distributor Remedies.*  (a) In the event the Company, for any reason whatsoever, refuses, fails or is unable to deliver any Kirby Product for which it has accepted Distributor's order, Distributor's sole and exclusive remedy shall be the recovery of so much of the purchase price, if any, paid by Distributor to the Company for such Kirby Product. In the event Distributor reasonably rejects, or revokes acceptance of, any Kirby Product, Distributor's sole and exclusive remedy shall be the recovery of any actual expense reasonably incurred by him/her in returning such Kirby Product to the Company and so much of the purchase price, if any, as may have been paid by Distributor to the Company for such Kirby Product. The Company shall not incur any liability whatsoever to Distributor for any delay or breach by Company if the same is due to an event of force majeure (as described in Section 26).  Under no circumstances shall the Company be liable to Distributor for any incidental, speculative or consequential damages arising out of any refusal or failure to accept any order of Distributor and/or deliver any Kirby Product to Distributor or any delay in the delivery thereof.

12.  *Warranty.*  The only warranty applicable to Kirby Systems is that set forth in the Company's Owner Care Booklet, as the same may be amended by the Company from time to time. THE REMEDIES PROVIDED BY SAID WARRANTY ARE EXCLUSIVE, AND THE COMPANY MAKES NO WARRANTIES WHICH EXTEND BEYOND THE STATEMENTS AND DESCRIPTION ON THE FACE THEREOF.

13. *Relationship of Parties.*

(a) *Independent Contractor Status.* The relationship established by this Agreement is that of vendor and vendee, and all obligations to be performed by Distributor under this Agreement shall be performed by him/her as an independent contractor. As such, Distributor is solely responsible for filing and paying all necessary federal, state and local taxes. In particular, Distributor will not be treated as an employee with respect to any services for federal or state tax purposes. Except as expressly provided herein, the Company shall exercise no control over the selection of Distributor's customers, Independent Dealers, Distributor Trainees, employees, agents or representatives. The full cost and responsibility for recruiting, hiring, firing, terminating and compensating independent contractors, agents, representatives and employees of Distributor shall be borne by Distributor.

(b) *No Agency Relationship.* Nothing in this Agreement or otherwise shall be construed as establishing Distributor as an agent, employee or legal representative of the Company for any purpose whatsoever.  Distributor is not authorized to transact business, incur obligations, sell goods, receive payments, solicit orders or assign or create any obligation of any kind, express or implied, on behalf of the Company, or to bind the Company in any way whatsoever, or to make any promise, warranty or representation on the Company's behalf with respect to products sold by the Company or any other matter, except as expressly authorized in writing by the Company. Distributor is not authorized to accept any service of process upon the Company or to receive any notice of any nature whatsoever on the Company's behalf.

14.  *Termination.*

(a) Either party shall have the right to terminate this Agreement, without cause (subject to state law, if applicable), at any time by giving written notice to the other party not less than thirty (30) days prior to the effective date of such termination.

(b) This Agreement shall, at the option of the Company, immediately terminate upon any of the following events: Distributor's death, Distributor's becoming bankrupt or insolvent, the placing of Distributor's business in the hands of a receiver or

U.S. - Rev. 12/08

trustee, Distributor's dissolution, or the institution of proceedings for the reorganization of the Distributor.

(c) The Company may terminate this Agreement for cause effective on such date as specified in the written notice of termination given to Distributor, in the event of (i) Distributor's breach of any covenant or obligation contained in this Agreement; (ii) false or fraudulent conduct of any kind by Distributor or any Distributor Parties; (iii) Distributor's being charged or indicted with any crime involving fraud, theft, violence or moral turpitude; or (iv) any change in the ownership or managerial authority of Distributor's distributorship.

(d) Notwithstanding anything to the contrary contained herein, in the event Distributor incurs any expenses, damages or other liabilities (including without limitation, reasonable attorney's fees) in connection with this Agreement, the Company's liability shall be limited to proven, direct, actual damages, and the Company's maximum liability to Distributor hereunder will not exceed the amount paid by Distributor to the Company for any as yet unsold Kirby Products. In no event will the Company be liable for consequential, punitive, indirect, reliance or incidental damages, whether or not the Company has been advised of the possibility of such damages.

(e) In no event will the termination of this Agreement operate as a cancellation of any indebtedness owing to one party by the other at the time of such termination. Distributor specifically authorizes the Company to offset ant funds owed by Distributor to the Company against any of Distributor's funds in the Company's possession or to which the Company has access.

15. *Repurchase of Systems.*

(a) Upon termination of this Agreement pursuant to Section 14(c) above, and subject to applicable state law, Distributor must sell and the Company must repurchase all new and unused Kirby Systems owned by Distributor on the effective date of said termination.

(b) Upon termination of this Agreement pursuant to any section other than Section 14(c), and subject to applicable state law, Distributor must sell and the Company has the option to repurchase all new and unused Kirby Systems owned by Distributor on the effective date of termination of this Agreement. The Company shall notify Distributor of its decision on repurchasing the Kirby Systems within two (2) business days after receipt of the list described in Section 15(c) below. If the Company elects not to repurchase the Kirby Systems, then: (i) Distributor may sell them in the normal course but only in strict accordance with Section 3 hereof; and (ii) the provisions of Section 16(a) shall become applicable to Distributor upon the earlier of the date upon which Distributor sells all remaining Kirby Systems owned by Distributor, or thirty (30) days after the effective date of termination of this Agreement.

(c) The repurchase prices for Kirby Systems shall be the prices originally paid by Distributor. Not more than two (2) business days after the effective date of such termination, Distributor shall deliver to the Company an itemized list showing all new and unused Kirby Systems owned by Distributor on the effective date of such termination, including the serial numbers of all Kirby Systems listed thereon. Distributor shall ship all Kirby Systems itemized on said list immediately upon receipt of shipping instructions from the Company. Repurchased Kirby Systems shall be shipped F.O.B. Distributor's location. Upon receipt of the Kirby Systems, the Company shall have the right to inspect and approve the Kirby Systems so shipped and the transaction shall be complete only upon such inspection and approval by the Company. The payment terms of any such repurchase by the Company shall be net 30 days after the Company's approval.

16. *Obligations and Restrictions Pre- and Post- Termination.*

(a) *Distributor's Obligations.* Upon any termination of this Agreement or if the Company does not renew this Agreement pursuant to Section 22 hereof, the Distributor shall as of the effective date of any termination or expiration:

(1) immediately and permanently discontinue, and cease and desist from (i) using in any advertising, display, telephone directory or listing, or printed matter whatsoever, the words "authorized", "dealer", "distributor", and/or any other word or words suggesting a dealership or distributorship in connection with the word "Kirby"; (ii) using, in any advertising, sign, display, telephone directory or listing, or printed matter whatsoever, any Kirby trademark, service mark or any distinctive Kirby symbol, logotype, emblem or commercial signature; (iii) using the word

7

U.S. - Rev. 12/08

"Kirby" as part of any trade or business name; (iv) using any written reproduction or colorable imitation of the words and/or phrases "Kirby Company", "Kirby Sales", "Kirby Service", and "Kirby Repair" or any phrase of similar import; and (v) engaging in any other activity or practice which would tend to indicate, suggest or represent, either directly or indirectly, that Distributor is part of the Company's sales network or that Distributor is authorized by the Company to sell or service Kirby Products; and

(2)  immediately notify Distributor's Independent Dealers and Distributor Trainees that their agreements with the Distributor pertaining to the distribution and sale of Kirby Products are terminated; and

(3)  immediately return to the Company any advertising sign leased through the Company pursuant to the terms of said lease.

(b) *Non-Competition.*  During the term of this Agreement and for one (1) year thereafter (regardless of the reason for the end of the term), the Distributor will not, directly or indirectly, by himself or through any entity, be employed by, consult for; contract with, provide services to, have an ownership interest in, be a distributor for, or otherwise affiliate with any person or entity (other than the Company) that, in whole or in part, engages in or assists with, directly or indirectly, the direct-selling and/or in-home demonstration of household appliances, furnishings, equipment, and/or related accessories used in the home (including, but not limited to, vacuum cleaners, cookware, air and/or water filtration or treatment systems, home security systems and furniture) anywhere in the United States.

(c) *Non-Solicitation.*  During the term of this Agreement and for two (2) years thereafter (regardless of the reason for the end of the term), the Distributor will not, directly or indirectly, for or on behalf of the Distributor or any other person or entity, solicit, recruit, or contract with (other than to sell Kirby Systems), attempt to solicit or recruit, or cause to be solicited or recruited any Current Kirby Regional Vice President, Divisional Director, Factory Distributor, Distributor Trainee, Dealer, Canvasser, customer, and/or any employee of the Company, and/or anyone else with an independent contractor agreement with the Company and/or with any of its distributors, anywhere in the world.  For purposes of this Agreement, the phrase "Current Kirby Regional Vice President, Divisional Director, Factory Distributor, Distributor Trainee, Dealer, Canvasser, customer, and/or any employee of the Company, and/or anyone else with an independent contractor agreement with the Company and/or with any of its distributors, anywhere in the world" shall include any Regional Vice President, Divisional Director, Factory Distributor, Distributor Trainee, Dealer, Canvasser, customer, employee of the Company and/or anyone else with a then-current independent contractor agreement with the Company and/or with any of its distributors, and/or those who had such a relationship with the Company or had such an agreement at any time during the twelve (12) months preceding the prohibited conduct.

(d) *Non-Disparagement.*  During the term of this Agreement and thereafter (regardless of the reason for the end of the term), Distributor agrees not to make any statement or take any action which disparages or defames the Company, its management, employees, independent contractors, distributors, products, and/or its practices.

(e) *Confidentiality.*  At all times during the continuance of this Agreement and after its termination:

(1) Distributor shall keep confidential all information disclosed to the Distributor by the Company (or by any of its other independent contractors) pursuant to or in connection with this Agreement, or which otherwise pertains to the Company or its business (whether such disclosure occurred orally or in writing, or before or during the continuance of this Agreement, and whether or not such information is expressly stated to be confidential or marked as such) (hereafter "Restricted Information"), including, but not limited to, not disclosing any Restricted Information to any other person or entity and not using any Restricted Information for any purpose other than the performance of the Distributor's obligations under this Agreement;

(2) Any Restricted Information may be disclosed by the Distributor to:

(a) any Distributors or prospective Distributors;
(b) any governmental or other authority or regulatory body; or
(c) any employees of the Distributor or of any of the aforementioned persons;

U.S. - Rev. 12/08

To such extent only as is necessary for the purposes contemplated by this Agreement or as is required by law and subject in each case to the Distributor using his best endeavors to ensure that the person in question keeps the same confidential and does not use the same except for the purposes for which the disclosure is made;

(3) Except as provided in paragraph 16(e)(2) above, no Restricted Information may be used by the Distributor for any purpose, or disclosed by the Distributor to any person, unless:

(a) the Restricted Information is at the date hereof, or hereafter becomes, public knowledge through no fault of the Distributor (provided that in so doing the Distributor shall not disclose any other Restricted Information which is not public knowledge); or

(b) the Distributor shows, to the reasonable satisfaction of the Company, that the Restricted Information was known to him prior to its being disclosed to the Distributor by the Company or its other independent contractors.

(f) *Costs of Enforcement.* If Distributor shall refuse or fails to comply with any of the foregoing provisions of this Section 16, Distributor shall promptly reimburse the Company for all costs, attorneys' fees, and/or other expenses incurred by the Company in connection with the enforcement of said provisions; provided, however, that the remedies provided herein shall not be exclusive of other remedies available to the Company.

17. *Complete Agreement.* This Agreement, including the Recitals and Exhibit A, constitutes the sole and entire agreement between the parties with respect to the subject matter herein and supersedes and replaces any and all prior agreements, understandings and arrangements, whether written or oral. This Agreement may only be changed, amended or modified in a writing signed by both parties, except that changes in prices, the Area, or the quota for the direct sales and the number of qualified Distributor Trainees to be recommended to the Company may be changed at Company's discretion.

18. *Severability.* If a court of competent jurisdiction determines any covenant herein to be unenforceable, then such court shall be empowered to reform such covenant in such a manner so that it is enforceable to the fullest extent permitted by law and to grant any other relief, at law or in equity, as may be reasonably necessary to protect the Company. In the event any term, phrase, clause or provision of this Agreement shall be deemed invalid, illegal or unenforceable in any respect or cannot be reformed to be enforceable as described above, the same shall be severable and the other provisions of this Agreement shall not, in any way, be affected or impaired thereby.

19. *Applicable Law.* This Agreement shall be construed under and governed by the law of the State of Ohio without giving effect to the choice of law principles of any jurisdiction.

20. *Jurisdictional Consent.* Distributor and Company irrevocably consent to the jurisdiction of the United States District Court for the Northern District of Ohio, Eastern Division, and the Court of Common Pleas, Cuyahoga County, Ohio, for the adjudication of any and all claims, actions, disputes or controversies between the parties, whether at law or in equity, arising from this Agreement or any other acts or transactions by Distributor, the Company, or any other person or entity. Said courts shall also be the exclusive forum for Distributor to bring any legal action against the Company, including, but not limited to, any action for damages or declaratory or injunctive relief that is related in any manner to this Agreement or the relationship between Distributor and the Company.

21. *Assignment.* This Agreement may not be assigned by the Distributor, in whole or in part, except with the prior written consent of the Company and only then if the assignee agrees to assume each and every obligation hereof.

22. *Notices.* Any written notice required or given shall be given by sending such written notice by registered or certified mail or overnight delivery service to the last known address of the party to be notified, provided that any policy statements, notice of a change in price, Area or quota for direct sales may be provided to Distributor by ordinary mail. Any written notice shall be deemed to have been given on the date such notice is deposited in the United States mail or with the overnight delivery service. Distributor shall notify the Company of any changes in Distributor's address within three (3) business days of such change.

U.S. - Rev. 12/08

23. *No Waiver.* Failure of the Company to enforce any provision of this Agreement, or to require performance by Distributor of any provision hereof, shall not be construed to be a waiver of such provision or of the right of the Company thereafter to enforce each and every provision hereof.

24. *Acceptance/Term of Agreement.* This Agreement shall not become effective until executed by an authorized representative of the Company. This Agreement shall remain in force, unless terminated, for one (1) year from the Effective Date. Unless terminated, the term of this Agreement shall be automatically renewed for successive terms of one year each unless Distributor is notified by the Company not less than thirty (30) days prior to an annual renewal date or any yearly renewal term thereafter, of its intention not to renew this Agreement.

25. *Headings.* The section headings of this Agreement are for purposes of reference only and shall not be referred to in interpreting its provisions.

26. *Adherence to Policy Statements.* The Company from time to time may issue written policy statements to which Distributor agrees to adhere.

27. *Force Majeure.* If the Company is prevented from or interfered with in any manner whatever in fully performing its duties or obligations hereunder by reason of any present or future law, regulation or order, act of God, earthquake, flood, fire, epidemic, accident, explosion, casualty, labor controversy (including but not limited to threatened or actual lockout, boycott or strike), riot, civil disturbance, war or armed conflict, act of terrorism or threat thereof, delay of a common carrier, inability without fault on the Company's part to obtain sufficient goods or services required in the conduct of its business, or by reason of any other cause or causes of any similar or dissimilar nature (all of the foregoing being herein referred to as an "event of force majeure"), then the Company's obligations hereunder shall be suspended as often as any such event of force majeure occurs and, during such occurrences, the Company's nonperformance will not be deemed a breach of this Agreement.

28. *Survival.* The Company's and Distributor's duties, obligations and responsibility for compliance with the provisions of Sections 7, 9, 11, 12, 13, 14(c), 15, 16, 21 and 22 shall survive this Agreement's cancellation, termination or expiration.

IN WITNESS WHEREOF, the parties hereto have signed duplicates of this Agreement as of the day and year first above written.

DISTRIBUTOR

*Marcus Obinn*
Print Name

_____
Signature

THE KIRBY COMPANY DIVISION
THE SCOTT FETZER COMPANY

By: _____
Laverne Knight

_____
Manager, Contract Administration

10                                                                U.S. - Rev. 12/08

# EXHIBIT 3



# ASSIGNMENT AND ASSUMPTION AGREEMENT

This Agreement and Assumption Agreement (hereinafter called "Agreement") is entered into on this _____22nd_____ day of

___March_____ ___2016____ , by and between _____Marcus P Quinn_____

(an "Individual") and ____Promotion Enterprises LLC_____

a corporation/partnership (please circle as appropriate) (the "Distributorship").

WHEREAS, the undersigned individual and The Kirby Company have heretofore entered into a certain Distributor Agreement by which the undersigned became an authorized distributor of Kirby products; and

WHEREAS, such Distributor Agreement provides that no assignment of the Agreement can be made without the specific written consent of Kirby; and

WHEREAS, paragraph #1 of said Distributor Agreement requires that I, personally, remain involved as the principal owner of the distributorship, having full managerial authority for the day-to-day operations of the distributorship.

NOW, THEREFORE, for good and valuable consideration the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.  I, the undersigned individual, hereby assign all right, title and interest I have in the Distributor Agreement to the Distributorship.

2.  Distributorship herewith accepts such assignment and assumes all obligations and duties of said individual under the Distributor Agreement.

3.  Distributorship specifically acknowledges that paragraph #1 of said Distributor Agreement requires the continued personal involvement of the individual distributor in the management and the day-to-day operations of the distributorship. The Distributorship further specifically agrees that if, for any reason, the Individual ceases to maintain involvement in the Distributorship to the extent required by the Distributor Agreement, then Kirby has the clear and unequivocal right to terminate this Agreement and the fact that it has been assigned to Distributorship and assumed by the Distributorship shall in no way affect Kirby's rights of termination.

4.  Individual agrees that he/she shall continue to be personally bound by, and shall comply with, all provisions of the Distributor Agreement including, but not limited to, the provisions contained in paragraph 1 of said Agreement entitled Principal Owner.

5.  Neither the Distributorship nor Individual shall, upon termination of said Distributor Agreement, engage in any activity prohibited by said Distributor Agreement whether as an individual, a partner, a joint venturer, employee, agent, salesman, consultant, officer, or director of any person, firm or partnership, or as a stockholder of any company in which Individual or Individual's spouse, child or parent owns, directly or indirectly, more than ten (10%) percent of the outstanding stock.

6.  Individual further agrees to personally guaranty to The Kirby Company any and all debts owing by and to The Kirby Company from Individual or from the Distributorship whether such debts were created before or after the execution of this Assignment and Assumption Agreement.

7.  The Distributorship specifically acknowledges and agrees that any earnings, awards, bonuses or payments that are granted, accounted for or accumulated for the Individual because of Individual's personal effects in selling and promoting Kirby's products, name and good will, shall continue to be the sole and exclusive property of Individual and Distributorship shall make no claim of any rights, title or interest to such bonuses, awards or accounts even though same may be the result of Individual's performance pursuant to the Distributor Agreement.

8.  This Assignment and Assumption Agreement shall be binding upon the heirs, successors and assigns of the parties hereto.

IN WITNESS WHEREOF, the parties have entered into this Assignment and Assumption Agreement as of the day and year first above written.

Distributor

_____
Individual        (Signature)

_marcus Quinn_
Individual        (Print Name)

Distributorship/Assignee

By: _____
                 (Signature)

Its: _____President_____
                 Title
        (i.e. President, Vice-President, Partner)

THE KIRBY COMPANY HEREWITH CONSENTS TO THIS
ASSIGNMENT AND ASSUMPTION AGREEMENT
ON THIS __22nd__ DAY OF __March__, __2016__

By: _Promotion Enterprises LLC_
              Name of Distributorship

The Kirby Company, a Division of
The Scott Fetzer Company

By: _____

Its: _____Manager of Contracts Administration_____

U.S. Revised 3/98

# EXHIBIT 4



## DISTRIBUTOR AGREEMENT

THIS DISTRIBUTOR AGREEMENT ("Agreement"), is made at Cleveland, Ohio, as of this 31ST day of AUGUST, 2006 , (the "Effective Date"), by and between The Kirby Company, a Division of The Scott Fetzer Company (a Delaware corporation), with its principal place of business located at 1920 W. 114th Street, Cleveland, Ohio 44102 (the "Company") and

NATHAN J RAMKER

an individual ("Distributor"), with a principal place of business located at

2720 LOCUST STREET DAVENPORT IA 52804

### RECITALS:

WHEREAS, the Company manufactures, assembles and distributes a home cleaning system consisting of vacuum cleaners, accessories, and attachments primarily for use by consumers in the home (hereinafter referred to as "Kirby Systems"); and parts (hereinafter referred to as "Kirby Parts"). Kirby Systems and Kirby Parts are hereinafter collectively referred to as "Kirby Products";

WHEREAS, the Company recognizes that superior products together with individualized customer in-home demonstration and installation and convenient customer service, including warranty service, are the hallmark of the Kirby trade name and the basis for the Company's reputation in the marketplace and its continuing ability to compete; and

WHEREAS, to protect and maintain the Kirby trade names, reputation and competitiveness in the marketplace, the Company has established and implemented a marketing system for distribution and sale of Kirby Systems exclusively to consumer end-users by in-home demonstration through authorized distributors qualified to provide such individualized customer demonstration and service (the "Marketing System"); and

WHEREAS, the Company has determined that consistent sale and distribution of Kirby Systems other than to consumer end-users by in-home individualized demonstration through authorized distributors qualified to provide such individualized customer service will substantially harm the Kirby trade names and its market reputation, thereby substantially reducing its ability to compete; and

WHEREAS, the Company, through its distributors, desires to sell a home cleaning system of superior quality, versatility and performance only to consumer end-users in the convenience of their homes and based on the merits of the product and using only lawful and ethical selling practices; and

WHEREAS, the Company is vitally concerned with protection and maintenance of its goodwill by assuring continuing satisfaction of consumer end-users with Kirby Products and requires that users have available through a local authorized distributor convenient and qualified installation, instruction and service; and

WHEREAS, the Company believes that the maintenance, promotion and preservation of its Marketing System and the provisions of this Agreement that implement that Marketing System, including the requirement for Distributor to present qualified persons from Distributor's own sales force to the Company for possible appointment as distributors, are essential to its ability to preserve its share of the market and to compete effectively with other manufacturers of home cleaning systems and related products;

Rev 7/06

and

WHEREAS, in keeping with the above-stated purposes, the Company will only appoint and retain distributors who are committed to the Company's Marketing System, who use lawful and ethical selling practices, who will provide convenient and qualified localized installation, instructions, and service and who will recommend to the Company qualified persons from within their own sales force for possible appointment by the Company as distributors; and

WHEREAS, Distributor represents that he/she is willing and able to commit to sell and distribute Kirby Systems in accordance with the Company's Marketing System and through lawful and ethical selling practices, will provide convenient and factory qualified installation, instructions, and service and will recommend to the Company qualified persons from within Distributor's own sales force for possible appointment as distributors.

Now, THEREFORE, in consideration of the above-stated premises, the parties hereto mutually agree as follows:

1.  *Principal Owner.* (a) The Company and Distributor agree that personal knowledge and experience in the sale of Kirby Products is essential to the success of Distributor and to the benefits to be gained by the Company as consideration under this Agreement. Distributor hereby represents, and the Company and Distributor therefore agree, that the Distributor is and will remain the principal owner of the distributorship, with full managerial authority for the day-to-day operations of the distributorship.

(b) The Company and Distributor further agree that the existence of this Agreement is dependent upon the continued functioning of the Distributor as the principal owner and manager and that any change in the ownership or managerial authority of the operations of the distributorship, or upon the substantial reduction or termination of managerial authority of Distributor for day-to-day operations of the distributorship, without the prior written approval of the Company may result in the immediate termination of this Agreement pursuant to Section 14(c) hereof.

2.  *Appointment.* (a) The Company hereby appoints Distributor as an authorized distributor of Kirby Products and assigns to Distributor, as his/her Area of primary responsibility, the geographic area (the "Area") described in Exhibit A, attached hereto and incorporated by reference herein. The Company shall have the right to change the Area from time to time and at any time by giving written notice thereof to Distributor, and any such change in the Area shall become effective on the date specified in said notice. All references in this Agreement to the Area shall be deemed to refer to the Area as it may be so changed by the Company.

(b) Distributor acknowledges that this appointment results from Distributor's demonstrated capabilities and personal experience in sales through in-home demonstrations in accordance with the Company's Marketing System, as well as Distributor's commitment to recommend to the Company qualified persons from Distributor's own sales force for possible appointment by the Company as distributors, and thus agrees that this Agreement is a personal service contract and will terminate automatically upon the death or disability of Distributor. Distributor further agrees that in the event his/her services are not available full time to the distributorship, this Agreement shall be subject to termination pursuant to Section 14(b) hereof.

(c) Distributor hereby accepts such appointment and agrees to comply with all of the terms of this Agreement and with all of the policies that may be established or revised from time to time by the Company.

3.  *Exclusively Consumer End-User Sales/Display of MSRP.* (a) Except for sales within Distributor's own sales force and commercial sales in accordance with Section 8, Distributor agrees that all Kirby Systems purchased hereunder are purchased solely and exclusively for resale by in-home individualized customer demonstration to consumer end-users pursuant to the Company's Marketing System, unless the Company otherwise expressly authorizes in writing. Distributor further agrees to use his/her best efforts to conduct the in-person demonstration in the home of the consumer end-user. Distributor agrees that any other resale is strictly prohibited by this Agreement and will constitute a material breach hereof by Distributor. Distributor agrees that he/she is directly and solely responsible for his/her Distributor Trainees' (as defined in Section 6(a)), Independent Dealers' (as defined in Section 6(b)) and/or employees' compliance with this section.

(b) It is a breach of this Agreement for Distributor or Distributor's agents, employees, Distributor Trainees, Independent Dealers or the like to sell any Kirby System to any person or entity if the purchase is for the purpose of re-sale, as opposed to consumer end-use.

(c) Distributor further agrees that he/she will not remove, obscure, deface or otherwise obstruct from obvious view any manufacturer's suggested retail price ("MSRP") placed by the Company on any Kirby Product, including but not limited to the Kirby System. Distributor shall take all steps necessary to ensure that any such MSRP remains readily and clearly visible to customers and prospective customers, which steps shall include Distributor advising his/her Independent Dealers, Distributor Trainees and employees of the obligation that any such MSRP shall be readily visible to customers and prospective customers and requiring that his/her Independent Dealers, Distributor Trainees and employees not remove, obscure, deface or otherwise obstruct from obvious view any such MSRP.

(d) A breach of any of the obligations contained in this Section 3 may result in the termination of this Agreement, pursuant to Section 14 (c), in addition to any other remedies to which the Company may be entitled.

4. *Prices and Terms.*

(a) *Distributor's Cost.* The prices to be paid by Distributor to the Company for Kirby Products purchased hereunder shall be the Company's established distributor net prices in effect at the time of shipment. The Company shall have the right to change any distributor net price from time to time and at any time by giving written notice thereof to Distributor, and any such change shall become effective on the date specified in said notice.

(b) *Company's Terms/Conditions of Sale.* All orders from Distributor for Kirby Products shall be subject to acceptance or rejection, in whole or in part, by the Company at its sole discretion, and any order or part thereof shall be deemed to have been accepted only by written confirmation or upon shipment by the Company. Kirby Products shall be shipped to Distributor F.O.B. Cleveland, Ohio; Andrews, Texas; or Company warehouse. All transportation and insurance expense and all risk of loss or damage after delivery by the Company to the initial forwarder or carrier shall be borne by Distributor. Despite any claim as to passage of title, the Company retains all security and other legal rights, including rights of resale, recession, stoppage in transit and the right to seize, reclaim and hold the Kirby Products in the carrier's or warehouseman's possession until such time as Distributor pays the purchase price in full. Company, at all times, also retains all rights to reclaim and seize Kirby Products for repurchase at cost from Distributor if Distributor is in breach of any term of this Agreement. Payment shall be Cash With Order, C.O.D., or as otherwise approved by the Company before shipment. In the event the Company incurs attorney's fees or costs associated with any collection effort arising out of the Company's sale of Kirby Products to Distributor, Distributor agrees to pay the Company's reasonable fees and costs associated therewith, plus interest accruing from the date payment was due.

5. *Trademark License.* The Company hereby grants to Distributor a non-exclusive license to use, without power to sublicense, in accordance with policies announced by the Company from time to time, the Company's trademarks, service marks, symbols, logotypes, emblems and commercial signatures in the Area in connection with Kirby Products, and in connection with Distributor-sponsored campaigns and promotions, provided, however, that (i) such license does not include the right to use any Company name, mark or symbol as a part of any Distributor's registered corporate name or to grant licensing authority to vendors for the purpose of resale; (ii) Distributor does not have the right under this license to use any Company name, mark or symbol in any electronic medium, including but not limited to the Internet, World Wide Web, radio and/or television broadcast; and (iii) all rights and licenses granted herein or pursuant hereto shall terminate automatically upon the termination of this Agreement for any reason. Prior to the use of any Company trademark, service mark, symbol, logo, emblem or commercial signature in any form of advertising or printed document. Distributor must receive advance written approval from the Company.

6. *Distributor's Primary Obligations.* (a) Distributor shall use his/her best efforts (as determined by the Company) in (i) promoting, maintaining and increasing the in-home sale and use of Kirby Systems in the Area through the development of a sales force devoted to the direct sale of Kirby Systems, exclusively to consumer end-users; (ii) providing or arranging for complete, convenient and qualified service to all users of Kirby Systems in the Area; and (iii) recommending to the Company qualified persons from Distributor's own sales force for possible approval by the Company (at Company's sole discretion) as distributors (such persons referred to as "Distributor Trainees"). All such efforts shall be in accordance with the purposes stated at the outset of this Agreement and all policies of the Company, as such policies may be established or revised from time to time by the Company. Unless expressly provided to the contrary in this Agreement, all obligations to be performed by Distributor shall be at Distributor's sole cost and expense.

(b) *Sales Force and Facilities*. Distributor shall: (i) maintain within the Area a proper and satisfactory office, sales meeting room and service facility (or arrange adequate and acceptable service facilities), acceptable to and in keeping with standards established by the Company from time to time; and (ii) establish and maintain in the Area a network of Independent Dealers for the exclusive in-home demonstration, installation, sale and service of Kirby Systems in accordance with the Company's Marketing System. As used herein, the term "Independent Dealer" shall refer to any person who receives Kirby Systems from the Distributor or a Distributor Trainee for sale in accordance with the Company's Marketing System. The appointment of such Independent Dealers by Distributor shall be in accordance with the purposes stated at the outset of this Agreement, and in compliance with the terms of this Agreement and all policies of the Company as such policies may be established or revised from time to time by the Company. Distributor shall take all necessary and appropriate action (at Distributor's sole cost and expense) to ensure that members of his/her sales force do not present a risk of harm to other persons, including customers and prospective customers. It is Distributor's responsibility to determine what actions are necessary and appropriate under the circumstances to fulfill this obligation, including, but not limited to performing criminal background checks.

(c) *Prohibited Sales of Kirby Products*. Distributor shall not sell or offer for sale as new any Kirby Products which have been used, reconditioned, rebuilt or returned by other consumers. Distributor shall not represent any Kirby Product to be new on which the name or serial number has been defaced or altered or from which such name or serial number has been removed. Distributor shall not in any way: (i) change, alter or participate in any change or alteration of any Kirby Product, including without limitation the removal or alteration of the name or serial number; (ii) sell any Kirby Product from which any serial number has been removed, defaced, covered, destroyed or otherwise altered; or (iii) sell any Kirby Product under circumstances which Distributor knows or reasonably should know will involve the removal, defacement, covering, alteration or destruction of any serial number.

(d) *Customer Service*. In order to protect the Company's goodwill and to maximize the use and appreciation of Kirby Systems, each consumer end-user of Kirby Systems in the Area shall have available from Distributor local, convenient and qualified installation, instruction and service. In fulfilling this obligation, Distributor shall:

(i)   comply with all service policies and procedures established from time to time by the Company;

(ii)  provide prompt, courteous, and efficient service on all Kirby Systems;

(iii) provide any repair service required of a Kirby System in accordance with the Kirby Limited Warranty;

(iv)  perform all service in a workmanlike manner and in accordance with professional standards and requirements of governmental authorities; and

(v)   carry in stock at all times an inventory of genuine Kirby Parts and/or parts sold or approved by the Company sufficient to enable performance of the foregoing service responsibilities.

Distributor shall receive and promptly investigate all complaints from consumer end-users of Kirby Systems in the Area, and shall make good-faith efforts to promptly resolve all complaints in a fair and equitable manner to the consumer end-user's satisfaction.

(e) *Requirements*. Distributor shall: (i) maintain an appropriate number of active full and part-time sales personnel to adequately solicit sales in and service his/her Area; (ii) as a minimum performance standard, attain the lesser of either thirty (30) purchases and sales of Kirby Systems per month, or a monthly sales frequency ratio of 1:500 (that is, one sale per 500 saleable households) for Distributor's Area; and (iii) recommend to the Company during each eighteen (18) month-period this Agreement is in effect at least one qualified person from his/her sales force for possible appointment by the Company as a factory distributor. Notwithstanding the minimum performance standards described above, Distributor shall make best efforts to attain at least fifty (50) purchases and sales of Kirby Systems per month. As used herein, a "sale" shall be deemed a "direct sale" if the Kirby System has been demonstrated and installed in the home of the consumer end-user, and the consumer end-user has received proper instruction with respect to the operation and maintenance of the Kirby System, at or before the time of the sale. Specific quotas for Distributor with respect to the number of Independent Dealers, direct sales for the Area or the number of qualified persons to be recommended for appointment as factory distributors may be established for the Area by the Company. The Company shall have the final authority to determine any such quotas as it sees fit in order to meet its marketing objectives.

Rev 7/06

(f) *Verification with Customer.* Distributor is responsible for all sales to consumer end-users. Therefore, in order to maintain and promote the image of the Kirby name, the Company recommends that Distributor verify and confirm: (i) the purchaser has received proper installation and instructions with respect to the operation and maintenance of the Kirby System; (ii) that all representations made to the purchaser by any Distributor Trainee or Independent Dealer have been completely fulfilled; and (iii) that the purchaser has retained an accurately completed copy of the appropriate Registration Card which has been signed by the authorized person.

(g) *Records.* Distributor shall maintain books and records which show, with respect to each Kirby Product sold or distributed by Distributor, the name and address of the purchaser, the date of sale, the serial number where applicable and any other information related to the Kirby Limited Warranty or related to the Company's obligations or responsibilities under federal, state or local consumer protection or safety statutes or regulations. Distributor shall retain all such books and records for at least five (5) years from the date of sale. Distributor shall, upon the Company's request, promptly furnish to the Company such books and records (or summaries or copies thereof, if so requested), as well as all other information, including reports, answers to questionnaires, etc., which may assist the Company in the proper conduct of its business.

(h) *Reports and Registration Cards:* Distributor shall promptly submit to the Company all reports required by the Company from time to time. For each sale of a Kirby System which is a direct sale as defined in Section 6(e) above, Distributor shall also submit the completed Registration Card signed by the consumer end-user. The Company shall pay to Distributor a fee (as determined by the Company) for each such Registration Card submitted by the Distributor within ninety (90) days from the date of the invoice reflecting Distributor's purchase of the Kirby System corresponding to such Registration Card. Failure to timely submit reports required by the Company and any appropriate Registration Cards or the submission of false or fraudulent information on any such report or Registration Cards may constitute grounds for immediate termination of this Agreement pursuant to Section 14(c) hereof.

7. *Legal and Ethical Requirements.* In connection with this Agreement and with Distributor's business of direct in-home sales of consumer products, Distributor agrees to abide by and adhere to all federal, state and local statutes, regulations and ordinances, including but not limited to the rules and regulations of the Federal Trade Commission. Distributor further agrees to comport his/her business to the highest of ethical standards (as determined by the Company in its sole discretion). Distributor shall be solely responsible for the conduct and sales techniques of his/her Independent Dealers, Distributor Trainees, employees and representatives.

8. *Multiple Sales to Commercial User.* Distributor may sell Kirby Systems to commercial users such as motels, restaurants or other commercial establishments; however, a sale of more than three (3) Kirby Systems to any one commercial user must be shipped by the Company directly to the commercial user. Distributor is obligated to notify the Company of any proposed sale of more than three (3) Kirby Systems to a commercial user and to assist in arranging for direct shipment of such Kirby Systems by the Company.

9. *Indemnification.*

(a) *Company's Indemnification.* The Company shall indemnify, defend and hold Distributor harmless from and against any and all liability, damage or expense incurred in connection with any claim, demand or suit (any "Claim") based on (i) infringement of any United States Patent by reason of Distributor's sale of any unaltered Kirby Product purchased from the Company, or (ii) infringement of any trademark by reason of Distributor's use of any trademark licensed hereunder; provided, however, that Distributor shall: (x) give the Company prompt written notice of any such Claim; (y) permit the Company to defend or settle any Claim; and (z) provide the Company with every reasonable assistance the Company may request in resisting such Claim. The foregoing indemnification obligation shall not apply if Distributor is alleged to be responsible for any negligence, misconduct or wrongdoing in connection with any such Claim.

(b) *Distributor's Indemnification.* Distributor shall indemnify, defend and hold harmless the Company, its officers, directors, employees, agents, representatives and servants (collectively, the "Company Indemnitees") from and against any and all liability, damage or expense incurred by any Company Indemnitees in connection with any Claim based in whole or in part on the actual or alleged (i) acts or omissions of Distributor, his/her sales force, employees, Independent Dealers and/or Distributor Trainees (collectively, the "Distributor Parties"); (ii) statements, representations or omissions made by any Distributor Parties in connection with any Kirby Products; or (iii) breach by Distributor of any obligation or covenant contained in this Agreement or any Company policy, as may be promulgated from time to time. In connection with any Claim, the Company shall: (y) give Distributor prompt

written notice of any such Claim; and (z) provide Distributor with every reasonable assistance which Distributor may request in resisting such Claim.

10. *Discontinuance and Modification of Kirby Products*. Company reserves the right at any time to change, modify or discontinue any model, type or design of any Kirby System or Kirby Parts provided to Distributor under this Agreement.

11. *Distributor Remedies*. (a) In the event the Company, for any reason whatsoever, refuses, fails or is unable to deliver any Kirby Product for which it has accepted Distributor's order, Distributor's sole and exclusive remedy shall be the recovery of so much of the purchase price, if any, paid by Distributor to the Company for such Kirby Product. In the event Distributor reasonably rejects, or revokes acceptance of, any Kirby Product, Distributor's sole and exclusive remedy shall be the recovery of any actual expense reasonably incurred by him/her in returning such Kirby Product to the Company and so much of the purchase price, if any, as may have been paid by Distributor to the Company for such Kirby Product. The Company shall not incur any liability whatsoever to Distributor for any delay or breach by Company if the same is due to an event of force majeure (as described in Section 25). Under no circumstances shall the Company be liable to Distributor for any incidental, speculative or consequential damages arising out of any refusal or failure to accept any order of Distributor and/or deliver any Kirby Product to Distributor or any delay in the delivery thereof.

(b) In the event Distributor commences any Claim against the Company related in any manner to this Agreement or the relationship between Distributor and the Company, such action shall be brought solely in the United States District Court for the Northern District of Ohio, Eastern Division or the Court of Common Pleas, Cuyahoga County, Ohio. Both parties hereto irrevocably consent to the jurisdiction of said courts.

12. *Warranty*. The only warranty applicable to Kirby Systems is that set forth in the Company's Owner Care Booklet, as the same may be amended by the Company from time to time. THE REMEDIES PROVIDED BY SAID WARRANTY ARE EXCLUSIVE, AND THE COMPANY MAKES NO WARRANTIES WHICH EXTEND BEYOND THE STATEMENTS AND DESCRIPTION ON THE FACE THEREOF.

13. *Relationship of Parties.*

(a) *Independent Contractor Status*. The relationship established by this Agreement is that of vendor and vendee, and all obligations to be performed by Distributor under this Agreement shall be performed by him/her as an independent contractor. As such, Distributor is solely responsible for filing and paying all necessary federal, state and local taxes. In particular, Distributor will not be treated as an employee with respect to any services for federal or state tax purposes. Except as expressly provided herein, the Company shall exercise no control over the selection of Distributor's customers, Independent Dealers, Distributor Trainees, employees, agents or representatives. The full cost and responsibility for recruiting, hiring, firing, terminating and compensating independent contractors, agents, representatives and employees of Distributor shall be borne by Distributor.

(b) *No Agency Relationship*. Nothing in this Agreement or otherwise shall be construed as establishing Distributor as an agent, employee or legal representative of the Company for any purpose whatsoever. Distributor is not authorized to transact business, incur obligations, sell goods, receive payments, solicit orders or assign or create any obligation of any kind, express or implied, on behalf of the Company, or to bind the Company in any way whatsoever, or to make any promise, warranty or representation on the Company's behalf with respect to products sold by the Company or any other matter, except as expressly authorized in writing by the Company. Distributor is not authorized to accept any service of process upon the Company or to receive any notice of any nature whatsoever on the Company's behalf.

14. *Termination*.

(a) Either party shall have the right to terminate this Agreement, without cause (subject to state law, if applicable), at any time by giving written notice to the other party not less than thirty (30) days prior to the effective date of such termination.

(b) This Agreement shall, at the option of the Company, immediately terminate upon any of the following events: Distributor's death, Distributor's becoming bankrupt or insolvent, the placing of Distributor's business in the hands of a receiver or trustee, Distributor's dissolution, or the institution of proceedings for the reorganization of the Distributor.

(c) The Company may terminate this Agreement for cause effective on such date as specified in the written notice of termination given to Distributor, in the event of (i) Distributor's breach of any covenant or obligation contained in this Agreement; (ii) false or fraudulent conduct of any kind by Distributor or any Distributor Parties; (iii) Distributor's being charged or indicted with any crime involving fraud, theft, violence or moral turpitude; or (iv) any change in the ownership or managerial authority of Distributor's distributorship.

(d) Notwithstanding anything to the contrary contained herein, in the event Distributor incurs any expenses, damages or other liabilities (including without limitation, reasonable attorney's fees) in connection with this Agreement, the Company's liability shall be limited to proven, direct, actual damages, and the Company's maximum liability to Distributor hereunder will not exceed the amount paid by Distributor to the Company for any as yet unsold Kirby Products. In no event will the Company be liable for consequential, punitive, indirect, reliance or incidental damages, whether or not the Company has been advised of the possibility of such damages.

(e) In no event will the termination of this Agreement operate as a cancellation of any indebtedness owing to one party by the other at the time of such termination. Distributor specifically authorizes the Company to offset any funds owed by Distributor to the Company against any of Distributor's funds in the Company's possession or to which the Company has access.

15. *Repurchase of Systems.*

(a) Upon termination of this Agreement pursuant to Section 14(c) above, and subject to applicable state law, Distributor must sell and the Company must repurchase all new and unused Kirby Systems owned by Distributor on the effective date of said termination.

(b) Upon termination of this Agreement pursuant to any section other than Section 14(c), and subject to applicable state law, Distributor must sell and the Company has the option to repurchase all new and unused Kirby Systems owned by Distributor on the effective date of termination of this Agreement. The Company shall notify Distributor of its decision on repurchasing the Kirby Systems within two (2) business days after receipt of the list described in Section 15(c) below. If the Company elects not to repurchase the Kirby Systems, then: (i) Distributor may sell them in the normal course but only in strict accordance with Section 3 hereof; and (ii) the provisions of Section 16(a) shall become applicable to Distributor upon the earlier of the date upon which Distributor sells all remaining Kirby Systems owned by Distributor, or thirty (30) days after the effective date of termination of this Agreement.

(c) The repurchase prices for Kirby Systems shall be the prices originally paid by Distributor. Not more than two (2) business days after the effective date of such termination, Distributor shall deliver to the Company an itemized list showing all new and unused Kirby Systems owned by Distributor on the effective date of such termination, including the serial numbers of all Kirby Systems listed thereon. Distributor shall ship all Kirby Systems itemized on said list immediately upon receipt of shipping instructions from the Company. Repurchased Kirby Systems shall be shipped F.O.B. Distributor's location. Upon receipt of the Kirby Systems, the Company shall have the right to inspect and approve the Kirby Systems so shipped and the transaction shall be complete only upon such inspection and approval by the Company. The payment terms of any such repurchase by the Company shall be net 30 days after the Company's approval.

16. *Obligations and Restrictions Pre- and Post- Termination.*

(a) *Distributor's Obligations.* Upon any termination of this Agreement or if the Company does not renew this Agreement pursuant to Section 22 hereof, the Distributor shall as of the effective date of any termination or expiration:

(1) immediately and permanently discontinue, and cease and desist from (i) using in any advertising, display, telephone directory or listing, or printed matter whatsoever, the words "authorized", "dealer", "distributor", and/or any other word or words suggesting a dealership or distributorship in connection with the word "Kirby"; (ii) using, in any advertising, sign, display, telephone directory or listing, or printed matter whatsoever, any

Kirby trademark, service mark or any distinctive Kirby symbol, logotype, emblem or commercial signature; (iii) using the word "Kirby" as part of any trade or business name; (iv) using any written reproduction or colorable imitation of the words and/or phrases "Kirby Company", "Kirby Sales", "Kirby Service", and "Kirby Repair" or any phrase of similar import; and (v) engaging in any other activity or practice which would tend to indicate, suggest or represent, either directly or indirectly, that Distributor is part of the Company's sales network or that Distributor is authorized by the Company to sell or service Kirby Products; and

(2) immediately notify Distributor's Independent Dealers and Distributor Trainees that their agreements with the Distributor pertaining to the distribution and sale of Kirby Products are terminated; and

(3) immediately return to the Company any advertising sign leased through the Company pursuant to the terms of said lease.

(b) *Covenant Not to Compete.* During the term of this Agreement and for one year thereafter (regardless of the reason for the end of the term), Distributor will not, directly or indirectly, be involved with the direct-selling and/or in-home demonstration of vacuum cleaners and related accessories in the Restricted Territory (as defined below) on behalf of any person or entity other than the Company. The "Restricted Territory" shall include the state or states in which Distributor is located and those in which Distributor has had substantial business relationships within the preceding eighteen months, either directly or through an associated person.

(c) *Non-Solicitation.* During the term of this Agreement and for one year thereafter (regardless of the reason for the end of the term), Distributor will not, directly or indirectly, solicit or recruit any Current Kirby Factory Distributors or Distributor Trainees. For the purposes of this clause, "Current Kirby Factory Distributors or Distributor Trainees" shall include those factory distributors and Distributor Trainees with a then-current agreement in connection with Company or any Kirby Products, as well as those who had such an agreement within the preceding twelve months.

(d) *Costs of Enforcement.* If Distributor shall refuse or fail to comply with any of the foregoing provisions of this Section 16, Distributor shall promptly reimburse the Company for all costs, attorneys' fees, and/or other expenses incurred by the Company in connection with the enforcement of said provisions; provided, however, that the remedies provided herein shall not be exclusive of other remedies available to the Company. This Section 16(d) shall not apply to California Distributors.

17. *Complete Agreement.* This Agreement, including the Recitals and Exhibit A, constitutes the sole and entire agreement between the parties with respect to the subject matter herein and supersedes and replaces any and all prior agreements, understandings and arrangements, whether written or oral. This Agreement may only be changed, amended or modified in a writing signed by both parties, except that changes in prices, the Area, or the quota for the direct sales and the number of qualified Distributor Trainees to be recommended to the Company may be changed at Company's discretion.

18. *Applicable Law.* This Agreement shall be construed under and governed by the law of the State of Ohio without giving effect to the choice of law principles therefore. If any provision of this Agreement is unenforceable or invalid, the Agreement shall be ineffective only to the extent of such provision, and the enforceability or validity of the remaining provisions of this Agreement shall not be affected thereby.

19. *Assignment.* This Agreement may not be assigned by Distributor, in whole or in part, except with the prior written consent of the Company and only then if the assignee agrees to assume each and every obligation hereof.

20. *Notices.* Any written notice required or given shall be given by sending such written notice by registered or certified mail or overnight delivery service to the last known address of the party to be notified, provided that any policy statements, notice of a change in price, Area or quota for direct sales may be provided to Distributor by ordinary mail. Any written notice shall be deemed to have been given on the date such notice is deposited in the United States mail or with the overnight delivery service. Distributor shall notify the Company of any changes in Distributor's address within three (3) business days of such change.

21. *No Waiver.* Failure of the Company to enforce any provision of this Agreement, or to require performance by Distributor of any provision hereof, shall not be construed to be a waiver of such provision or of the right of the Company thereafter to enforce each

Rev 7/06

and every provision hereof.

22. *Acceptance/Term of Agreement.* This Agreement shall not become effective until executed by an authorized representative of the Company.  This Agreement shall remain in force, unless terminated, for one (1) year from the Effective Date.  Unless terminated, the term of this Agreement shall be automatically renewed for successive terms of one year each unless Distributor is notified by the Company not less than thirty (30) days prior to an annual renewal date or any yearly renewal term thereafter, of its intention not to renew this Agreement.

23. *Headings.* The section headings of this Agreement are for purposes of reference only and shall not be referred to in interpreting its provisions.

24. *Adherence to Policy Statements.* The Company from time to time may issue written policy statements to which Distributor agrees to adhere.

25. *Force Majeure.* If the Company is prevented from or interfered with in any manner whatever in fully performing its duties or obligations hereunder by reason of any present or future law, regulation or order, act of God, earthquake, flood, fire, epidemic, accident, explosion, casualty, labor controversy (including but not limited to threatened or actual lockout, boycott or strike), riot, civil disturbance, war or armed conflict, act of terrorism or threat thereof, delay of a common carrier, inability without fault on the Company's part to obtain sufficient goods or services required in the conduct of its business, or by reason of any other cause or causes of any similar or dissimilar nature (all of the foregoing being herein referred to as an "event of force majeure"), then the Company's obligations hereunder shall be suspended as often as any such event of force majeure occurs and, during such occurrences, the Company's nonperformance will not be deemed a breach of this Agreement.

26. *Survival.* The Company's and Distributor's duties, obligations and responsibility for compliance with the provisions of Sections 7, 9, 11, 12, 13, 14(e), 15, 16 and 18 shall survive this Agreement's cancellation, termination or expiration.

27. *Confidentiality.* Distributor agrees that any confidential, proprietary, non-public business, financial or technical information, know how, trade secrets or other confidential or proprietary information to which Distributor becomes privy due to or in connection with his/her relationship with the Company are strictly confidential and Distributor shall not disclose any such information to any third party without the prior written consent of the Company.

IN WITNESS WHEREOF, the parties hereto have signed duplicates of this Agreement as of the day and year first above written.

DISTRIBUTOR

THE KIRBY COMPANY DIVISION
THE SCOTT FETZER COMPANY

_____
Print Name

By: _____
Susan M. Biebelhausen

_____
Signature

_____
Manager, Contract Administration

Printed in the U.S.A.

# EXHIBIT 5

United States



## DISTRIBUTOR AGREEMENT

THIS DISTRIBUTOR AGREEMENT hereinafter called "Agreement"), is made at Cleveland, Ohio, as of this 1ST day of JANUARY, 2009, (the "Effective Date"), by and between **The Kirby Company,** a Division of **The Scott Fetzer Company** (a Delaware corporation) with its principal place of business located at 1920 W. 114th Street, Cleveland, Ohio 44102 (hereinafter called the "Company") and   NATHAN J RAMKER

an individual ("Distributor"), with a principal place of business located at   2504 W CENTRAL PARK AVENUE

DAVENPORT  IA .   52804

## RECITALS:

WHEREAS, the Company manufactures, assembles and distributes a home cleaning system consisting of vacuum cleaners, accessories, and attachments primarily for use by consumers in the home (hereinafter referred to as "Kirby Systems"); and parts (hereinafter referred to as "Kirby Parts"). Kirby Systems and Kirby Parts are hereinafter collectively referred to as "Kirby Products;" and

WHEREAS, the Company recognizes that superior products together with individualized customer in-home demonstration and installation and convenient customer service, including warranty service, are the hallmark of the Kirby trade name and the basis for the Company's reputation in the marketplace and its continuing ability to compete; and

WHEREAS, to protect and maintain the Kirby trade names, reputation and competitiveness in the marketplace, the Company has established and implemented a marketing system for distribution and sale of Kirby Systems exclusively to consumer end-users by in-home demonstration through authorized distributors qualified to provide such individualized customer demonstration and service (the "Marketing System"); and

WHEREAS, the Company has determined that consistent sale and distribution of Kirby Systems other than to consumer end-users by in-home individualized demonstration through authorized distributors qualified to provide such individualized customer service will substantially harm the Kirby trade names and its market reputation, thereby substantially reducing its ability to compete; and

WHEREAS, the Company, through its distributors, desires to sell a home cleaning system of superior quality, versatility and performance only to consumer end-users in the convenience of their homes and based on the merits of the product and using only lawful and ethical selling practices; and

WHEREAS, the Company is vitally concerned with protection and maintenance of its goodwill by assuring continuing satisfaction of consumer end-users with Kirby Products and requires that users have available through a local authorized distributor convenient and qualified installation, instruction and service; and

WHEREAS, the Company believes that the maintenance, promotion and preservation of its Marketing System and the provisions of this Agreement that implement that Marketing System, including the requirement for Distributor to present qualified persons from Distributor's own sales force to the Company for possible appointment as distributors, are essential to its ability to preserve its share of the market and to compete effectively with other manufacturers of home cleaning systems and related products; and

U.S. - Rev. 12/08

WHEREAS, in keeping with the above-stated purposes, the Company will only appoint and retain distributors who are committed to the Company's Marketing System, who use lawful and ethical selling practices, who will provide convenient and qualified localized installation, instructions, and service and who will recommend to the Company qualified persons from within their own sales force for possible appointment by the Company as distributors; and

WHEREAS, Distributor represents that he/she is willing and able to commit to sell and distribute Kirby Systems in accordance with the Company's Marketing System and through lawful and ethical selling practices, will provide convenient and factory qualified installation, instructions, and service and will recommend to the Company qualified persons from within Distributor's own sales force for possible appointment as distributors.

Now, THEREFORE, in consideration of the above-stated premises, and other valuable consideration provided to Distributor (including, but not limited to, access to and the opportunity to use and profit from the Company's proprietary business model and confidential information, under the terms set forth herein), the receipt and sufficiency of which are hereby acknowledged, the parties hereto mutually agree as follows:

1. *Principal Owner.* (a) The Company and Distributor agree that personal knowledge and experience in the sale of Kirby Products is essential to the success of Distributor and to the benefits to be gained by the Company as consideration under this Agreement. Distributor hereby represents, and the Company and Distributor therefore agree, that the Distributor is and will remain the principal owner of the distributorship, with full managerial authority for the day-to-day operations of the distributorship.

(b) The Company and Distributor further agree that the existence of this Agreement is dependent upon the continued functioning of the Distributor as the principal owner and manager and that any change in the ownership or managerial authority of the operations of the distributorship, or upon the substantial reduction or termination of managerial authority of Distributor for day-to-day operations of the distributorship, without the prior written approval of the Company may result in the immediate termination of this Agreement pursuant to Section 14(c) hereof.

2. *Appointment.* (a) The Company hereby appoints Distributor as an authorized distributor of Kirby Products and assigns to Distributor, as his/her Area of primary responsibility, the geographic area (the "Area") described in Exhibit A, attached hereto and incorporated by reference herein. The Company shall have the right to change the Area from time to time and at any time by giving written notice thereof to Distributor, and any such change in the Area shall become effective on the date specified in said notice. All references in this Agreement to the Area shall be deemed to refer to the Area as it may be so changed by the Company.

(b) Distributor acknowledges that this appointment results from Distributor's demonstrated capabilities and personal experience in sales through in-home demonstrations in accordance with the Company's Marketing System, as well as Distributor's commitment to recommend to the Company qualified persons from Distributor's own sales force for possible appointment by the Company as distributors, and thus agrees that this Agreement is a personal service contract and will terminate automatically upon the death or disability of Distributor. Distributor further agrees that in the event his/her services are not available full time to the distributorship, this Agreement shall be subject to termination pursuant to Section 14(b) hereof.

(c) Distributor hereby accepts such appointment and agrees to comply with all of the terms of this Agreement and with all of the policies that may be established or revised from time to time by the Company.

3. *Exclusively Consumer End-User Sales/Display of MSRP.* (a) Except for sales within Distributor's own sales force and commercial sales in accordance with Section 8, Distributor agrees that all Kirby Systems purchased hereunder are purchased solely and exclusively for resale by in-home individualized customer demonstration to consumer end-users pursuant to the Company's Marketing System, unless the Company otherwise expressly authorizes in writing. Distributor further agrees to use his/her best efforts to conduct the in-person demonstration in the home of the consumer end-user. Distributor agrees that any other resale is strictly prohibited by this Agreement and will constitute a material breach hereof by Distributor. Distributor agrees that he/she is directly and solely responsible for his/her Distributor Trainees' (as defined in Section 6(a)), independent Dealers' (as defined in Section 6(b)) and/or employees' compliance with this section.

(b) It is a breach of this Agreement for Distributor or Distributor's agents, employees, Distributor Trainees, Independent Dealers or the like to sell any Kirby System to any person or entity if the purchase is for the purpose of re-sale, as opposed to

U.S. - Rev. 12/08

(c) Distributor further agrees that he/she will not remove, obscure, deface or otherwise obstruct from obvious view any manufacturer's suggested retail price ("MSRP") placed by the Company on any Kirby Product, including but not limited to the Kirby System. Distributor shall take all steps necessary to ensure that any such MSRP remains readily and clearly visible to customers and prospective customers, which steps shall include Distributor advising his/her Independent Dealers, Distributor Trainees and employees of the obligation that any such MSRP shall be readily visible to customers and prospective customers and requiring that his/her Independent Dealers, Distributor Trainees and employees not remove, obscure, deface or otherwise obstruct from obvious view any such MSRP.

(d) A breach of any of the obligations contained in this Section 3 may result in the termination of this Agreement, pursuant to Section 14(c), in addition to any other remedies to which the Company may be entitled.

4. *Prices and Terms.*

(a) *Distributor's Cost.* The prices to be paid by Distributor to the Company for Kirby Products purchased hereunder shall be the Company's established distributor net prices in effect at the time of shipment. The Company shall have the right to change any distributor net price from time to time and at any time by giving written notice thereof to Distributor, and any such change shall become effective on the date specified in said notice.

(b) *Company's Terms/Conditions of Sale.* All orders from Distributor for Kirby Products shall be subject to acceptance or rejection, in whole or in part, by the Company at Cleveland, Ohio. And any order shall be deemed to have been accepted only upon shipment by the Company. Kirby Products shall be shipped to Distributor F.O.B. Cleveland, Ohio; Andrews, Texas; or Company warehouse. All transportation and insurance expense and all risk of loss or damage after delivery by the Company to the initial forwarder or carrier shall be borne by Distributor. Despite any claim as to passage of title, the Company retains all security and other legal rights, including rights of resale, recession, stoppage in transit and the right to seize, reclaim and hold the Kirby Products in the carrier's or warehouseman's possession until such time as Distributor pays the purchase price in full. Company, at all times, also retains all rights to reclaim and seize Kirby Products for repurchase at cost from Distributor if Distributor is in breach of any term of this Agreement. Payment shall be Cash With Order, C.O.D., or as otherwise approved by the Company before shipment. In the event the Company incurs attorney's fees or costs associated with any collection effort arising out of the Company's sale of Kirby Products to Distributor, Distributor agrees to pay the Company's reasonable fees and costs associated therewith, plus interest accruing from the date payment was due.

5. *Trademark License.* The Company hereby grants to Distributor a non-exclusive license to use, without power to sublicense, in accordance with policies announced by the Company from time to time, the Company's trademarks, service marks, symbols, logotypes, emblems and commercial signatures in the Area in connection with Kirby Products, and in connection with Distributor-sponsored campaigns and promotions, provided, however, that (i) such license does not include the right to use any Company name, mark or symbol as a part of any Distributor's registered corporate name or to grant licensing authority to vendors for the purpose of resale; (ii) Distributor does not have the right under this license to use any Company name, mark or symbol in any electronic medium, including but not limited to the Internet, World Wide Web, radio and/or television broadcast; and (iii) all rights and licenses granted herein or pursuant hereto shall terminate automatically upon the termination of this Agreement for any reason. Prior to the use of any Company trademark, service mark, symbol, logo, emblem or commercial signature in any form of advertising or printed document, Distributor must receive advance written approval from the Company.

6. *Distributor's Primary Obligations.* (a) Distributor shall use his/her best efforts (as determined by the Company) in (i) promoting, maintaining and increasing the in-home sale and use of Kirby Systems in the Area through the development of a sales force devoted solely to the direct sale of Kirby Systems; (ii) providing or arranging for complete, convenient and qualified service to all users of Kirby Systems in the Area; and (iii) recommending to the Company qualified persons from Distributor's sales force for possible approval by the Company (at Company's sole discretion) as distributors (such persons referred to as "Distributor Trainees"). All such efforts shall be in accordance with purposes stated at the outset of this Agreement and all policies of the Company, as such policies may be established or revised from time to time by the Company. In addition, Distributor also agrees that he/she shall not, directly or indirectly, have an ownership interest in or participate in any other business or businesses in the Area that market or sell

products to consumer end-users by in-home demonstration. Unless expressly provided for in this Agreement, all obligations to be performed by Distributor shall be at Distributor's sole cost and expense.

(b) *Sales Force and Facilities.* Distributor shall: (i) maintain within the Area a proper and satisfactory office, sales meeting room and service facility (or arrange adequate and acceptable service facilities), acceptable to and in keeping with standards established by the Company from time to time; and (ii) establish and maintain in the Area a network of Independent Dealers for the exclusive in-home demonstration, installation, sale and service of Kirby Systems in accordance with the Company's Marketing System. As used herein, the term "Independent Dealer" shall refer to any person who receives Kirby Systems from the Distributor or a Distributor Trainee for sale in accordance with the Company's Marketing System. The appointment of such Independent Dealers by Distributor shall be in accordance with the purposes stated at the outset of this Agreement, and in compliance with the terms of this Agreement and all policies of the Company as such policies may be established or revised from time to time by the Company. Distributor shall take all necessary and appropriate action (at Distributor's sole cost and expense) to ensure that members of his/her sales force do not present a risk of harm to other persons, including customers and prospective customers. It is Distributor's responsibility to determine what actions are necessary and appropriate under the circumstances to fulfill this obligation, including, but not limited to performing criminal background checks.

(c) *Prohibited Sales of Kirby Products.* Distributor shall not sell or offer for sale as new any Kirby Products which have been used, reconditioned, rebuilt or returned by other consumers. Distributor shall not represent any Kirby Product to be new on which the name or serial number has been defaced or altered or from which such name or serial number has been removed. Distributor shall not in any way: (i) change, alter or participate in any change or alteration of any Kirby Product, including without limitation the removal or alteration of the name or serial number; (ii) sell any Kirby Product from which any serial number has been removed, defaced, covered, destroyed or otherwise altered; or (iii) sell any Kirby Product under circumstances which Distributor knows or reasonably should know will involve the removal, defacement, covering, alteration or destruction of any serial number.

(d) *Customer Service.* In order to protect the Company's goodwill and to maximize the use and appreciation of Kirby Systems, each consumer end-user of Kirby Systems in the Area shall have available from Distributor local, convenient and qualified installation, instruction and service. In fulfilling this obligation, Distributor shall:

    (i)    comply with all service policies and procedures established from time to time by the Company;

    (ii)    provide prompt, courteous, and efficient service on all Kirby Systems;

    (iii)    provide any repair service required of a Kirby System in accordance with the Kirby Limited Warranty;

    (iv)    perform all service in a workmanlike manner and in accordance with professional standards and requirements of governmental authorities; and

    (v)    carry in stock at all times an inventory of genuine Kirby Parts and/or parts sold or approved by the Company sufficient to enable performance of the foregoing service responsibilities.

Distributor shall receive and promptly investigate all complaints from consumer end-users of Kirby Systems in the Area, and shall make good-faith efforts to promptly resolve all complaints in a fair and equitable manner to the consumer end-user's satisfaction.

(e) *Requirements.* Distributor shall: (i) maintain an appropriate number of active full and part-time sales personnel to adequately solicit sales in and service his/her Area; (ii) as a minimum performance standard, attain the lesser of either thirty (30) purchases and sales of Kirby Systems per month, or a monthly sales frequency ratio of 1:500 (that is, one sale per 500 saleable households) for Distributor's Area; and (iii) recommend to the Company during each eighteen (18) month-period this Agreement is in effect at least one qualified person from his/her sales force for possible appointment by the Company as a factory distributor. Notwithstanding the minimum performance standards described above, Distributor shall make best efforts to attain at least fifty (50) purchases and sales of Kirby Systems per month. As used herein, a "sale" shall be deemed a "direct sale" if the Kirby System has been demonstrated and installed in the home of the consumer end-user, and the consumer end-user has received proper instruction with respect to the operation and maintenance of the Kirby System, at or before the time of the sale. Specific quotas for Distributor

4

with respect to the number of Independent Dealers, direct sales for the Area or the number of qualified persons to be recommended for appointment as factory distributors may be established for the Area by the Company. The Company shall have the final authority to determine any such quotas as it sees fit in order to meet its marketing objectives.

(f) *Verification with Customer.* Distributor is responsible for all sales to consumer end-users. Therefore, in order to maintain and promote the image of the Kirby name, the Company recommends that Distributor verify and confirm: (i) the purchaser has received proper installation and instructions with respect to the operation and maintenance of the Kirby System; (ii) that all representations made to the purchaser by any Distributor Trainee or Independent Dealer have been completely fulfilled; and (iii) that the purchaser has retained an accurately completed copy of the appropriate Registration Card which has been signed by the authorized person.

(g) *Records.* Distributor shall maintain books and records which show, with respect to each Kirby Product sold or distributed by Distributor, the name and address of the purchaser, the date of sale, the serial number where applicable and any other information related to the Kirby Limited Warranty or related to the Company's obligations or responsibilities under federal, state or local consumer protection or safety statutes or regulations. Distributor shall retain all such books and records for at least five (5) years from the date of sale. Distributor shall, upon the Company's request, promptly furnish to the Company such books and records (or summaries or copies thereof, if so requested), as well as all other information, including reports, answers to questionnaires, etc., which may assist the Company in the proper conduct of its business.

(h) *Reports and Registration Cards.* Distributor shall submit to the Company, monthly, a Consumer Installation Report in accordance with and on forms provided by the Company, and such other reports as the Company reasonably requests.. Distributor shall report only firm sales, defined as sales which have been verified by Distributor, approved by any bank or financial company, if applicable, and on which the buyer's right to cancel, if applicable, has elapsed. For each sale of a Kirby System, which is a direct sale as defined in Section 6(e) above, Distributor shall also submit the completed Registration Card signed by the consumer end-user. The Company shall pay to Distributor a fee (as determined by the Company) for each such Registration Card submitted by the Distributor within ninety (90) days from the date of the invoice reflecting Distributor's purchase of the Kirby System corresponding to such Registration Card. Failure to. timely submit reports required by the Company and any appropriate Registration Cards or the submission of false or fraudulent information on any such report or Registration Cards may constitute grounds for immediate termination of this Agreement pursuant to Section 14(c) hereof.

7. *Legal and Ethical Requirements.* In connection with this Agreement and with Distributor's business of direct in-home sales of consumer products, Distributor agrees to abide by and adhere to all federal, state and local statutes, regulations and ordinances, including but not limited to the rules and regulations of the Federal Trade Commission. Distributor further agrees to comport his/her business to the highest of ethical standards (as determined by the Company in its sole discretion). Distributor shall be solely responsible for the conduct and sales techniques of his/her Independent Dealers, Distributor Trainees, employees and representatives.

8. *Multiple Sales to Commercial User.* Distributor may sell Kirby Systems to commercial users such as motels, restaurants or other commercial establishments; however, a sale of more than three (3) Kirby Systems to any one commercial user must be shipped by the Company directly to the commercial user. Distributor is obligated to notify the Company of any proposed sale of more than three (3) Kirby Systems to a commercial user and to assist in arranging for direct shipment of such Kirby Systems by the Company.

9. *Indemnification.*

(a) *Company's Indemnification.* The Company shall indemnify, defend and hold Distributor harmless from and against any and all liability, damage or expense incurred in connection with any claim, demand or suit (any "Claim") based on (i) infringement of any United States Patent by reason of Distributor's sale of any unaltered Kirby Product purchased from the Company, or (ii) infringement of any trademark by reason of Distributor's use of any trademark licensed hereunder; provided, however, that Distributor shall: (x) give the Company prompt written notice of any such Claim; (y) permit the Company to defend or settle any Claim; and (z) provide the Company with every reasonable assistance the Company may request in resisting such Claim. The foregoing indemnification obligation shall not apply if Distributor is alleged to be responsible for any negligence, misconduct or wrongdoing in connection with any such Claim.

(b) *Distributor Indemnification*. Distributor shall indemnify, defend and hold harmless the Company, its officers, directors, employees, agents, representatives and servants (collectively, the "Company Indemnitees") from and against any and all liability, damage or expense incurred by any Company Indemnitees in connection with any Claim based in whole or in part on the actual or alleged (i) acts or omissions of Distributor, his/her sales force, employees, Independent Dealers and/or Distributor Trainees (collectively, the "Distributor Parties"); (ii) statements, representations or omissions made by any Distributor Parties in connection with any Kirby Products; or (iii) breach by Distributor of any obligation or covenant contained in this Agreement or any Company policy, as may be promulgated from time to time. In connection with any Claim, the Company shall: (y) give Distributor prompt written notice of any such Claim; and (z) provide Distributor with every reasonable assistance which Distributor may request in resisting such Claim.

10. *Discontinuance and Modification of Kirby Products*. Company reserves the right at any time to change, modify or discontinue any model, type or design of any Kirby System or Kirby Parts provided to Distributor under this Agreement.

11. *Distributor Remedies*. (a) In the event the Company, for any reason whatsoever, refuses, fails or is unable to deliver any Kirby Product for which it has accepted Distributor's order, Distributor's sole and exclusive remedy shall be the recovery of so much of the purchase price, if any, paid by Distributor to the Company for such Kirby Product. In the event Distributor reasonably rejects, or revokes acceptance of, any Kirby Product, Distributor's sole and exclusive remedy shall be the recovery of any actual expense reasonably incurred by him/her in returning such Kirby Product to the Company and so much of the purchase price, if any, as may have been paid by Distributor to the Company for such Kirby Product. The Company shall not incur any liability whatsoever to Distributor for any delay or breach by Company if the same is due to an event of force majeure (as described in Section 26). Under no circumstances shall the Company be liable to Distributor for any incidental, speculative or consequential damages arising out of any refusal or failure to accept any order of Distributor and/or deliver any Kirby Product to Distributor or any delay in the delivery thereof.

12. *Warranty*. The only warranty applicable to Kirby Systems is that set forth in the Company's Owner Care Booklet, as the same may be amended by the Company from time to time. THE REMEDIES PROVIDED BY SAID WARRANTY ARE EXCLUSIVE, AND THE COMPANY MAKES NO WARRANTIES WHICH EXTEND BEYOND THE STATEMENTS AND DESCRIPTION ON THE FACE THEREOF.

13. *Relationship of Parties*.

(a) *Independent Contractor Status*. The relationship established by this Agreement is that of vendor and vendee, and all obligations to be performed by Distributor under this Agreement shall be performed by him/her as an independent contractor. As such, Distributor is solely responsible for filing and paying all necessary federal, state and local taxes. In particular, Distributor will not be treated as an employee with respect to any services for federal or state tax purposes. Except as expressly provided herein, the Company shall exercise no control over the selection of Distributor's customers, Independent Dealers, Distributor Trainees, employees, agents or representatives. The full cost and responsibility for recruiting, hiring, firing, terminating and compensating independent contractors, agents, representatives and employees of Distributor shall be borne by Distributor.

(b) *No Agency Relationship*. Nothing in this Agreement or otherwise shall be construed as establishing Distributor as an agent, employee or legal representative of the Company for any purpose whatsoever. Distributor is not authorized to transact business, incur obligations, sell goods, receive payments, solicit orders or assign or create any obligation of any kind, express or implied, on behalf of the Company, or to bind the Company in any way whatsoever, or to make any promise, warranty or representation on the Company's behalf with respect to products sold by the Company or any other matter, except as expressly authorized in writing by the Company. Distributor is not authorized to accept any service of process upon the Company or to receive any notice of any nature whatsoever on the Company's behalf.

14. *Termination*.

(a) Either party shall have the right to terminate this Agreement, without cause (subject to state law, if applicable), at any time by giving written notice to the other party not less than thirty (30) days prior to the effective date of such termination.

(b) This Agreement shall, at the option of the Company, immediately terminate upon any of the following events: Distributor's death, Distributor's becoming bankrupt or insolvent, the placing of Distributor's business in the hands of a receiver or

6

U.S. - Rev. 12/08

(c) The Company may terminate this Agreement for cause effective on such date as specified in the written notice of termination given to Distributor, in the event of (i) Distributor's breach of any covenant or obligation contained in this Agreement; (ii) false or fraudulent conduct of any kind by Distributor or any Distributor Parties; (iii) Distributor's being charged or indicted with any crime involving fraud, theft, violence or moral turpitude; or (iv) any change in the ownership or managerial authority of Distributor's distributorship.

(d) Notwithstanding anything to the contrary contained herein, in the event Distributor incurs any expenses, damages or other liabilities (including without limitation, reasonable attorney's fees) in connection with this Agreement, the Company's liability shall be limited to proven, direct, actual damages, and the Company's maximum liability to Distributor hereunder will not exceed the amount paid by Distributor to the Company for any as yet unsold Kirby Products. In no event will the Company be liable for consequential, punitive, indirect, reliance or incidental damages, whether or not the Company has been advised of the possibility of such damages.

(e) In no event will the termination of this Agreement operate as a cancellation of any indebtedness owing to one party by the other at the time of such termination. Distributor specifically authorizes the Company to offset ant funds owed by Distributor to the Company against any of Distributor's funds in the Company's possession or to which the Company has access.

15. *Repurchase of Systems.*

(a) Upon termination of this Agreement pursuant to Section 14(c) above, and subject to applicable state law, Distributor must sell and the Company must repurchase all new and unused Kirby Systems owned by Distributor on the effective date of said termination.

(b) Upon termination of this Agreement pursuant to any section other than Section 14(c), and subject to applicable state law, Distributor must sell and the Company has the option to repurchase all new and unused Kirby Systems owned by Distributor on the effective date of termination of this Agreement. The Company shall notify Distributor of its decision on repurchasing the Kirby Systems within two (2) business days after receipt of the list described in Section 15(c) below. If the Company elects not to repurchase the Kirby Systems, then: (i) Distributor may sell them in the normal course but only in strict accordance with Section 3 hereof; and (ii) the provisions of Section 16(a) shall become applicable to Distributor upon the earlier of the date upon which Distributor sells all remaining Kirby Systems owned by Distributor, or thirty (30) days after the effective date of termination of this Agreement.

(c) The repurchase prices for Kirby Systems shall be the prices originally paid by Distributor. Not more than two (2) business days after the effective date of such termination, Distributor shall deliver to the Company an itemized list showing all new and unused Kirby Systems owned by Distributor on the effective date of such termination, including the serial numbers of all Kirby Systems listed thereon. Distributor shall ship all Kirby Systems itemized on said list immediately upon receipt of shipping instructions from the Company. Repurchased Kirby Systems shall be shipped F.O.B. Distributor's location. Upon receipt of the Kirby Systems, the Company shall have the right to inspect and approve the Kirby Systems so shipped and the transaction shall be complete only upon such inspection and approval by the Company. The payment terms of any such repurchase by the Company shall be net 30 days after the Company's approval.

16. *Obligations and Restrictions Pre- and Post- Termination.*

(a) *Distributor's Obligations.* Upon any termination of this Agreement or if the Company does not renew this Agreement pursuant to Section 22 hereof, the Distributor shall as of the effective date of any termination or expiration:

(1) immediately and permanently discontinue, and cease and desist from (i) using in any advertising, display, telephone directory or listing, or printed matter whatsoever, the words "authorized", "dealer", "distributor", and/or any other word or words suggesting a dealership or distributorship in connection with the word "Kirby"; (ii) using, in any advertising, sign, display, telephone directory or listing, or printed matter whatsoever, any Kirby trademark, service mark or any distinctive Kirby symbol, logotype, emblem or commercial signature; (iii) using the word

Kirby's part-or-any trade or business name (including any written reproduction or colorable imitation of the words and/or phrases "Kirby Company", "Kirby Sales". "Kirby Service", and "Kirby Repair" or any phrase of similar import; and (v) engaging in any other activity or practice which would tend to indicate, suggest or represent, either directly or indirectly, that Distributor is part of the Company's sales network or that Distributor is authorized by the Company to sell or service Kirby Products; and

 (2) immediately notify Distributor's Independent Dealers and Distributor Trainees that their agreements with the Distributor pertaining to the distribution and sale of Kirby Products are terminated; and

 (3) immediately return to the Company any advertising sign leased through the Company pursuant to the terms of said lease.

(b) *Non-Competition.* During the term of this Agreement and for one (1) year thereafter (regardless of the reason for the end of the term), the Distributor will not, directly or indirectly, by himself or through any entity, be employed by, consult for; contract with, provide services to, have an ownership interest in, be a distributor for, or otherwise affiliate with any person or entity (other than the Company) that, in whole or in part, engages in or assists with, directly or indirectly, the direct-selling and/or in-home demonstration of household appliances, furnishings, equipment, and/or related accessories used in the home (including, but not limited to, vacuum cleaners, cookware, air and/or water filtration or treatment systems, home security systems and furniture) anywhere in the United States.

(c) *Non-Solicitation.* During the term of this Agreement and for two (2) years thereafter (regardless of the reason for the end of the term), the Distributor will not, directly or indirectly, for or on behalf of the Distributor or any other person or entity, solicit. recruit, or contract with (other than to sell Kirby Systems), attempt to solicit or recruit, or cause to be solicited or recruited any Current Kirby Regional Vice President, Divisional Director, Factory Distributor, Distributor Trainee, Dealer, Canvasser, customer, and/or any employee of the Company, and/or anyone else with an independent contractor agreement with the Company and/or with any of its distributors, anywhere in the world. For purposes of this Agreement, the phrase "Current Kirby Regional Vice President, Divisional Director, Factory Distributor, Distributor Trainee, Dealer, Canvasser, customer, and/or any employee of the Company, and/or anyone else with an independent contractor agreement with the Company and/or with any of its distributors, anywhere in the world" shall include any Regional Vice President, Divisional Director, Factory Distributor, Distributor Trainee, Dealer, Canvasser, customer, employee of the Company and/or anyone else with a then-current independent contractor agreement with the Company and/or with any of its distributors, and/or those who had such a relationship with the Company or had such an agreement at any time during the twelve (12) months preceding the prohibited conduct.

(d) *Non-Disparagement.* During the term of this Agreement and thereafter (regardless of the reason for the end of the term), Distributor agrees not to make any statement or take any action which disparages or defames the Company, its management, employees, independent contractors, distributors, products, and/or its practices.

(e) *Confidentiality.* At all times during the continuance of this Agreement and after its termination:

 (1) Distributor shall keep confidential all information disclosed to the Distributor by the Company (or by any of its other independent contractors) pursuant to or in connection with this Agreement, or which otherwise pertains to the Company or its business (whether such disclosure occurred orally or in writing, or before or during the continuance of this Agreement, and whether or not such information is expressly stated to be confidential or marked as such) (hereafter "Restricted Information"), including, but not limited to, not disclosing any Restricted Information to any other person or entity and not using any Restricted Information for any purpose other than the performance of the Distributor's obligations under this Agreement;

 (2) Any Restricted Information may be disclosed by the Distributor to:

  (a) any Distributors or prospective Distributors;
  (b) any governmental or other authority or regulatory body; or
  (c) any employees of the Distributor or of any of the aforementioned persons;

To such extent only as is necessary for the purposes contemplated by this Agreement or as is required by law and subject in each case to the Distributor using his best endeavors to ensure that the person in question keeps the same confidential and does not use the same except for the purposes for which the disclosure is made;

(3) Except as provided in paragraph 16(e)(2) above, no Restricted Information may be used by the Distributor for any purpose, or disclosed by the Distributor to any person, unless:

(a) the Restricted Information is at the date hereof, or hereafter becomes, public knowledge through no fault of the Distributor (provided that in so doing the Distributor shall not disclose any other Restricted Information which is not public knowledge); or

(b) the Distributor shows, to the reasonable satisfaction of the Company, that the Restricted Information was known to him prior to its being disclosed to the Distributor by the Company or its other independent contractors.

(f) *Costs of Enforcement.* If Distributor shall refuse or fails to comply with any of the foregoing provisions of this Section 16, Distributor shall promptly reimburse the Company for all costs, attorneys' fees, and/or other expenses incurred by the Company in connection with the enforcement of said provisions; provided, however, that the remedies provided herein shall not be exclusive of other remedies available to the Company.

17. *Complete Agreement.* This Agreement, including the Recitals and Exhibit A, constitutes the sole and entire agreement between the parties with respect to the subject matter herein and supersedes and replaces any and all prior agreements, understandings and arrangements, whether written or oral. This Agreement may only be changed, amended or modified in a writing signed by both parties, except that changes in prices, the Area, or the quota for the direct sales and the number of qualified Distributor Trainees to be recommended to the Company may be changed at Company's discretion.

18. *Severability.* If a court of competent jurisdiction determines any covenant herein to be unenforceable, then such court shall be empowered to reform such covenant in such manner so that it is enforceable to the fullest extent permitted by law and to grant any other relief, at law or in equity, as may be reasonably necessary to protect the Company. In the event any term, phrase, clause or provision of this Agreement shall be deemed invalid, illegal or unenforceable in any respect or cannot be reformed to be enforceable as described above, the same shall be severable and the other provisions of this Agreement shall not, in any way, be affected or impaired thereby.

19. *Applicable Law.* This Agreement shall be construed under and governed by the law of the State of Ohio without giving effect to the choice of law principles of any jurisdiction.

20. *Jurisdictional Consent.* Distributor and Company irrevocably consent to the jurisdiction of the United States District Court for the Northern District of Ohio, Eastern Division, and the Court of Common Pleas, Cuyahoga County, Ohio, for the adjudication of any and all claims, actions, disputes or controversies between the parties, whether at law or in equity, arising from this Agreement or any other acts or transactions by Distributor, the Company, or any other person or entity. Said courts shall also be the exclusive forum for Distributor to bring any legal action against the Company, including, but not limited to, any action for damages or declaratory or injunctive relief that is related in any manner to this Agreement or the relationship between Distributor and the Company.

21. *Assignment.* This Agreement may not be assigned by the Distributor, in whole or in part, except with the prior written consent of the Company and only then if the assignee agrees to assume each and every obligation hereof.

22. *Notices.* Any written notice required or given shall be given by sending such written notice by registered or certified mail or overnight delivery service to the last known address of the party to be notified, provided that any policy statements, notice of a change in price, Area or quota for direct sales may be provided to Distributor by ordinary mail. Any written notice shall be deemed to have been given on the date such notice is deposited in the United States mail or with the overnight delivery service. Distributor shall notify the Company of any changes in Distributor's address within three (3) business days of such change.

23. *No Waiver.* Failure of the Company to enforce any provision of this Agreement or to require performance by Distributor of any provision hereof, shall not be construed to be a waiver of such provision or of the right of the Company thereafter to enforce each and every provision hereof.

24. *Acceptance/Term of Agreement.* This Agreement shall not become effective until executed by an authorized representative of the Company. This Agreement shall remain in force, unless terminated, for one (1) year from the Effective Date. Unless terminated, the term of this Agreement shall be automatically renewed for successive terms of one year each unless Distributor is notified by the Company not less than thirty (30) days prior to an annual renewal date or any yearly renewal term thereafter, of its intention not to renew this Agreement.

25. *Headings.* The section headings of this Agreement are for purposes of reference only and shall not be referred to in interpreting its provisions.

26. *Adherence to Policy Statements.* The Company from time to time may issue written policy statements to which Distributor agrees to adhere.

27. *Force Majeure.* If the Company is prevented from or interfered with in any manner whatever in fully performing its duties or obligations hereunder by reason of any present or future law, regulation or order, act of God, earthquake, flood, fire, epidemic, accident, explosion, casualty, labor controversy (including but not limited to threatened or actual lockout, boycott or strike), riot, civil disturbance, war or armed conflict, act of terrorism or threat thereof, delay of a common carrier, inability without fault on the Company's part to obtain sufficient goods or services required in the conduct of its business, or by reason of any other cause or causes of any similar or dissimilar nature (all of the foregoing being herein referred to as an "event of force majeure"), then the Company's obligations hereunder shall be suspended as often as any such event of force majeure occurs and, during such occurrences, the Company's nonperformance will not be deemed a breach of this Agreement.

28. *Survival.* The Company's and Distributor's duties, obligations and responsibility for compliance with the provisions of Sections 7, 9, 11, 12, 13, 14(e), 15, 16, 21 and 22 shall survive this Agreement's cancellation, termination or expiration.

IN WITNESS WHEREOF, the parties hereto have signed duplicates of this Agreement as of the day and year first above written.

DISTRIBUTOR

THE KIRBY COMPANY DIVISION
THE SCOTT FETZER COMPANY

_____
Print Name

By: _____
Laverne Knight

_____
Signature

_____
Manager, Contract Administration

# EXHIBIT 6



# ASSIGNMENT AND ASSUMPTION AGREEMENT

This Agreement and Assumption Agreement (hereinafter called "Agreement") is entered into on this _____ 11th _____ day of

_ December _____ 2014 _____, by and between _____ Nathan  J  Ramker _____

(an "Individual") and _____ Top Notch & Associates Inc _____

a **corporation**/partnership (please circle as appropriate) (the "Distributorship").

WHEREAS, the undersigned individual and The Kirby Company have heretofore entered into a certain Distributor Agreement by which the undersigned became an authorized distributor of Kirby products; and

WHEREAS, such Distributor Agreement provides that no assignment of the Agreement can be made without the specific written consent of Kirby; and

WHEREAS, paragraph #1 of said Distributor Agreement requires that I, personally, remain involved as the principal owner of the distributorship, having full managerial authority for the day-to-day operations of the distributorship.

NOW, THEREFORE, for good and valuable consideration the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.  I, the undersigned individual, hereby assign all right, title and interest I have in the Distributor Agreement to the Distributorship.

2.  Distributorship herewith accepts such assignment and assumes all obligations and duties of said individual under the Distributor Agreement.

3.  Distributorship specifically acknowledges that paragraph #1 of said Distributor Agreement requires the continued personal involvement of the individual distributor in the management and the day-to-day operations of the distributorship.  The Distributorship further specifically agrees that if, for any reason, the Individual ceases to maintain involvement in the Distributorship to the extent required by the Distributor Agreement, then Kirby has the clear and unequivocal right to terminate this Agreement and the fact that it has been assigned to Distributorship and assumed by the Distributorship shall in no way affect Kirby's rights of termination.

4.  Individual agrees that he/she shall continue to be personally bound by, and shall comply with, all provisions of the Distributor Agreement including, but not limited to, the provisions contained in paragraph 1 of said Agreement entitled **Principal Owner**.

5.  Neither the Distributorship nor Individual shall, upon termination of said Distributor Agreement, engage in any activity prohibited by said Distributor Agreement whether as an individual, a partner, a joint venturer, employee, agent, salesman, consultant, officer, or director of any person, firm or partnership, or as a stockholder of any company in which Individual or Individual's spouse, child or parent owns, directly or indirectly, more than ten (10%) percent of the outstanding stock.

6.  Individual further agrees to personally guaranty to The Kirby Company any and all debts owing by and to The Kirby Company from Individual or from the Distributorship whether such debts were created before or after the execution of this Assignment and Assumption Agreement.

7.      The Distributorship specifically acknowledges and agrees that any earnings, awards, bonuses or payments that are granted, accounted for or accumulated for the Individual because of Individual's personal efforts in selling and promoting Kirby's products, name and good will, shall continue to be the sole and exclusive property of Individual and Distributorship shall make no claim of any rights, title or interest to such bonuses, awards or accounts even though same may be the result of Individual's performance pursuant to the Distributor Agreement.

8.      This Assignment and Assumption Agreement shall be binding upon the heirs, successors and assigns of the parties hereto.

IN WITNESS WHEREOF, the parties have entered into this Assignment and Assumption Agreement as of the day and year first above written.

Distributor                                         Distributorship/Assignee

_____     By: _____
Individual      (Signature)                              (Signature)

_____     Its: _____
Individual      (Print Name)                            Title
                                                         (i.e. President, Vice-President, Partner)


THE KIRBY COMPANY HEREWITH CONSENTS TO THIS
ASSIGNMENT AND ASSUMPTION AGREEMENT
ON THIS ___11___ DAY OF __December, 2014__.


By: __Top Notch Associates Inc__
        Name of Distributorship

The Kirby Company, a Division of
The Scott Fetzer Company

By: _____

Its: _____Manager of Contracts Administration_____


U.S. Revised 3/98

# EXHIBIT 7



# KIRBY®

## a Scott Fetzer company

# ASSIGNMENT AND ASSUMPTION AGREEMENT

This Agreement and Assumption Agreement (hereinafter called "Agreement") is entered into on this _____ 2nd _____ day of

_____ October _____ 2017 _____, by and between _____ Nathan J Ramker _____

(an "Individual") and _____ Big River HCS Inc _____
a corporation/partnership (please circle as appropriate) (the "Distributorship").

WHEREAS, the undersigned individual and The Kirby Company have heretofore entered into a certain Distributor Agreement by which the undersigned became an authorized distributor of Kirby products; and

WHEREAS, such Distributor Agreement provides that no assignment of the Agreement can be made without the specific written consent of Kirby; and

WHEREAS, paragraph #1 of said Distributor Agreement requires that I, personally, remain involved as the principal owner of the distributorship, having full managerial authority for the day-to-day operations of the distributorship.

NOW, THEREFORE, for good and valuable consideration the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.    I, the undersigned individual, hereby assign all right, title and interest I have in the Distributor Agreement to the Distributorship.

2.    Distributorship herewith accepts such assignment and assumes all obligations and duties of said individual under the Distributor Agreement.

3.    Distributorship specifically acknowledges that paragraph #1 of said Distributor Agreement requires the continued personal involvement of the individual distributor in the management and the day-to-day operations of the distributorship.  The Distributorship further specifically agrees that if, for any reason, the Individual ceases to maintain involvement in the Distributorship to the extent required by the Distributor Agreement, then Kirby has the clear and unequivocal right to terminate this Agreement and the fact that it has been assigned to Distributorship and assumed by the Distributorship shall in no way affect Kirby's rights of termination.

4.    Individual agrees that he/she shall continue to be personally bound by, and shall comply with, all provisions of the Distributor Agreement including, but not limited to, the provisions contained in paragraph 1 of said Agreement entitled **Principal Owner**.

5.    Neither the Distributorship nor Individual shall, upon termination of said Distributor Agreement, engage in any activity prohibited by said Distributor Agreement whether as an individual, a partner, a joint venturer, employee, agent, salesman, consultant, officer, or director of any person, firm or partnership, or as a stockholder of any company in which Individual or Individual's spouse, child or parent owns, directly or indirectly, more than ten (10%) percent of the outstanding stock.

6.    Individual further agrees to personally guaranty to The Kirby Company any and all debts owing by and to The Kirby Company from Individual or from the Distributorship whether such debts were created before or after the execution of this Assignment and Assumption Agreement.

7.     The Distributorship specifically acknowledges and agrees that any earnings, awards, bonuses or payments that are granted, accounted for or accumulated for the Individual because of Individual's personal effects in selling and promoting Kirby's products, name and good will, shall continue to be the sole and exclusive property of Individual and Distributorship shall make no claim of any rights, title or interest to such bonuses, awards or accounts even though same may be the result of Individual's performance pursuant to the Distributor Agreement.

8.     This Assignment and Assumption Agreement shall be binding upon the heirs, successors and assigns of the parties hereto.

IN WITNESS WHEREOF, the parties have entered into this Assignment and Assumption Agreement as of the day and year first above written.

Distributor

_____
Individual        (Signature)

_____
Individual        (Print Name)

Distributorship/Assignee

By: _____
                (Signature)

Its: _____
                Title
        (i.e. President, Vice-President, Partner)

THE KIRBY COMPANY HEREWITH CONSENTS TO THIS
ASSIGNMENT AND ASSUMPTION AGREEMENT
ON THIS ___2nd___ DAY OF ___October___, __2017__.

By: __Big River HCS Inc_____
            Name of Distributorship

The Kirby Company, a Division of
The Scott Fetzer Company

By: __Candice S_____
            Candice Starnes

Its: _____Manager of Contracts Administration____

U.S. Revised 3/98

| CASE NO. | | SUMMONS NO. | CLEVELAND, OHIO 44113 |
|---|---|---|---|
| CV19914924 | D1 FX | 38537890 | Rule 4 (B) Ohio |

Rules of Civil
Procedure

| | |
|---|---|
| SCOTT FETZER COMPANY<br>**vs**<br>MARCUS QUINN, ET AL. | **PLAINTIFF**<br><br>**DEFENDANT** |

**SUMMONS**

MARCUS QUINN
1703 PALMA SOLA BLVD.
BRADENTON FL 34209

**You have been named defendant in a sums complaint** (copy attached hereto) filed in Cuyahoga County Court of Common Pleas, Cuyahoga County Justice Center, Cleveland, Ohio 44113, by the plaintiff named herein.

**You are hereby summoned and required to answer** the complaint within 28 days after service of this summons upon you, exclusive of the day of service.

#### Said answer is required to be served on:



**Said answer is required to be served on Plaintiff's Attorney** (Address denoted by arrow at left.)

Plaintiff's Attorney

COLLIN R. FLAKE
901 LAKESIDE AVENUE

CLEVELAND, OH 44114-0000

**Your answer must also be filed with the court** within 3 days after service of said answer on plaintiff's attorney.

**If you fail to do so, judgment by default will be** rendered against you for the relief demanded in the complaint.

#### Case has been assigned to Judge:

CASSANDRA COLLIER-WILLIAMS
Do not contact judge. Judge's name is given for attorney's reference only.



**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

| DATE SENT |
|---|
| May 6, 2019 |

By 
    Deputy

COMPLAINT FILED    05/06/2019

SN130

CLEVELAND, OHIO 44113

| CASE NO. | | SUMMONS NO. |
|---|---|---|
| CV19914924 | D2 FX | 38537891 |

Rule 4 (B) Ohio

Rules of Civil
Procedure

| SCOTT FETZER COMPANY | **PLAINTIFF** |
|---|---|
| **VS** | |
| MARCUS QUINN, ET AL. | **DEFENDANT** |

## SUMMONS

NATHAN RAMKER
13420 COONHUNTERS ROAD
BLUEGRASS IA 52726

You have been named defendant in a sums
complaint (copy attached hereto) filed in Cuyahoga
County Court of Common Pleas, Cuyahoga County
Justice Center, Cleveland, Ohio 44113, by the
plaintiff named herein.

You are hereby summoned and required to answer
the complaint within 28 days after service of this
summons upon you, exclusive of the day of service.

Said answer is required to be served on:



Said answer is required to be served on Plaintiff's
Attorney (Address denoted by arrow at left.)

Plaintiff's Attorney

Your answer must also be filed with the court
within 3 days after service of said answer on
plaintiff's attorney.

COLLIN R. FLAKE
901 LAKESIDE AVENUE

CLEVELAND, OH 44114-0000

If you fail to do so, judgment by default will be
rendered against you for the relief demanded in the
complaint.

Case has been assigned to Judge:

CASSANDRA COLLIER-WILLIAMS
Do not contact judge. Judge's name is given for
attorney's reference only.



**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

| DATE SENT | |
|---|---|
| May 6, 2019 | |

By _____



Deputy

COMPLAINT FILED    05/06/2019

SN130

CLEVELAND, OHIO 44113

| CASE NO. | | SUMMONS NO. |
|----------|-----|-------------|
| CV19914924 | D3 FX | 38537892 |

Rule 4 (B) Ohio

Rules of Civil
Procedure

| | |
|---|---|
| SCOTT FETZER COMPANY<br>VS<br>MARCUS QUINN, ET AL. | **PLAINTIFF**<br><br>**DEFENDANT** |

**SUMMONS**

SUNFLORA, INC.
8413 LAUREL FAIR CIRCLE, SUITE 100
TAMPA FL 33610

You have been named defendant in a sums
complaint (copy attached hereto) filed in Cuyahoga
County Court of Common Pleas, Cuyahoga County
Justice Center, Cleveland, Ohio 44113, by the
plaintiff named herein.

You are hereby summoned and required to answer
the complaint within 28 days after service of this
summons upon you, exclusive of the day of service.

**Said answer is required to be served on:**



Said answer is required to be served on Plaintiff's
Attorney (Address denoted by arrow at left.)

Plaintiff's Attorney

COLLIN R. FLAKE
901 LAKESIDE AVENUE

CLEVELAND, OH 44114-0000

Your answer must also be filed with the court
within 3 days after service of said answer on
plaintiff's attorney.

If you fail to do so, judgment by default will be
rendered against you for the relief demanded in the
complaint.

**Case has been assigned to Judge:**

CASSANDRA COLLIER-WILLIAMS
**Do not contact judge. Judge's name is given for
attorney's reference only.**



**NAILAH K. BYRD**
Clerk of the Court of Common Pleas

| DATE SENT |
|-----------|
| May 6, 2019 |

By _____
Deputy

COMPLAINT FILED    05/06/2019

SN130